# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

Susan Illis, and all others similarly situated,

         Plaintiff,

v.

Optum, Inc.; OptumRx Holdings, L.L.C.;
OptumRx, Inc.; United HealthCare
Services, Inc.; and UnitedHealth Group
Incorporated;

         Defendants.

Civil Action No. _____

**CLASS ACTION COMPLAINT**

---

522446.1

## TABLE OF CONTENTS

I.  INTRODUCTION ...................................................................................... 1

II.  PARTIES ................................................................................................... 4

  A.  Plaintiff ................................................................................................ 4

  B.  Defendants ............................................................................................ 5

III.  JURISDICTION AND VENUE ................................................................ 7

IV.  FACTUAL ALLEGATIONS .................................................................... 8

  A.  EpiPen .................................................................................................. 8

  B.  Prescription Drug Distribution and Reimbursement ........................ 11

    1.  *The Prescription Drug Distribution Chain* ............................... 11

    2.  *The Prescription Drug Reimbursement Chain* ......................... 12

  C.  Defendants Exploit Their Position at the Hub of Prescription Drug
    Reimbursement to Enrich Themselves ............................................. 16

    1.  *PBM Reimbursement Contracts with Third-Party Payers* ....... 16

    2.  *PBM Reimbursement Contracts with Retail Pharmacies* ........ 19

  D.  PBMs' "Rebate" Game and Skyrocketing Prescription Drug Prices ............ 20

    1.  *Rebates Generally* ................................................................... 21

    2.  *Rebates Heavily Influence Formularies* ................................. 22

    3.  *Inflation Protection Rebates* ................................................... 28

    4.  *Administrative Fees* ................................................................ 30

    5.  *The Lack of Transparency into PBM Contracts with Drug Companies Allows
    PBMs to Retain Substantial Amounts of Rebates, Administrative Fees, and
    Other Monies* ........................................................................... 33

    6.  *Rebate Calculation and Invoicing Is Tied to the Administration of Benefits for
    Class Members' EpiPen Prescriptions* ................................... 39

E.   Recent Data Demonstrates That Rebates and Other Monies Paid to PBMs Account for the Bulk of List Price Increases for Brand Name Drugs Like EpiPen ............................................................................... 43

F.   Out-Of-Pocket Costs for Plan Members with Prescription Drug Benefits ..... 47

G.   Increases In EpiPen's List Price Are Caused By Defendants' Collection of Increasing "Rebates" And Other Monies ............................................ 54

   1.   *Mylan and Other Drug Companies State That PBMs' Collection of Rebates and Other Monies Cause Them to Increase List Prices* .................................... 54

   2.   *Industry Experts Similarly State That PBMs' Collection of Rebates and Other Monies Cause Drug Companies to Increase List Prices* .................................... 56

   3.   *Competition between EpiPen and Its Competitors for Formulary Placement Further Demonstrates that PBM Rebates Induce List Price Increases for EpiPen* ................................................................ 59

H.   Mylan's Payments of Rebates and Other Monies to Defendants Increases Out-of-Pocket Expenses for Plan Members Who Fill EpiPen Prescriptions under Deductibles and Coinsurance Provisions ................................ 61

I.   Plaintiff's EpiPen Purchase ......................................................... 65

V.   CLASS ALLEGATIONS .................................................................... 65

VI.   CLAIMS FOR RELIEF ..................................................................... 69

A.   Fiduciary Duties under ERISA ...................................................... 72

   1.   *The Duty of Loyalty* ............................................................. 72

   2.   *The Duty Not to Deal in Plan Assets for One's Own Interest or Account* ..... 73

   3.   *The Duty to Avoid Conflicted Transactions* ................................... 74

B.   Co-Fiduciary Liability ................................................................. 76

C.   Non-Fiduciary Liability .............................................................. 79

FIRST CLAIM FOR RELIEF ....................................................................... 82

SECOND CLAIM FOR RELIEF .................................................................... 83

THIRD CLAIM FOR RELIEF ...................................................................... 86

**FOURTH CLAIM FOR RELIEF** ............................................................ **87**

**VII.   PRAYER FOR RELIEF** ............................................................ **88**

522446.1

## I.      INTRODUCTION

1.      This is an action under the Employee Retirement Income Security Act of 1974 ("ERISA") on behalf of all persons in the United States and its territories who are or were participants in, or beneficiaries of, health insurance plans governed by ERISA who, pursuant to the terms of their health insurance plans, paid any portion of the purchase price for EpiPen, EpiPen Jr., EpiPen 2-Pak, or EpiPen Jr. 2-Pak, calculated by reference to a benchmark price (the "Class," as defined in detail in Section V below).

2.      EpiPen, EpiPen Jr., EpiPen 2-Pak, and EpiPen Jr. 2-Pak (collectively, "EpiPen") are devices designed to inject epinephrine into a person experiencing a severe, life-threatening allergic reaction known as anaphylaxis.[1]  Approximately 43 million people in the United States are at risk of suffering anaphylaxis, and more than 3.6 million EpiPen prescriptions were written in 2015.  The list price[2] of an EpiPen 2-Pak has continuously increased from $93.88 in 2007 to $608.61 in 2016.

3.      Under ERISA, a fiduciary is required to discharge its duties with respect to an ERISA-governed health insurance plan solely in the interest of the plan's participants and beneficiaries (collectively, "plan members") and for the exclusive purpose of providing benefits to plan members.  ERISA also prohibits fiduciaries from dealing with plan benefits for their own account or engaging in any transaction involving an ERISA-

---

[1]   An EpiPen 2-Pak is a package containing two EpiPen devices.  Since 2001, EpiPen prescriptions filled at retail pharmacies generally have been dispensed in 2-Paks.

[2] The list price is also known as the Wholesale Acquisition Cost (WAC) of a drug. As discussed in detail below, WAC is a benchmark price.

1

governed health insurance plan on behalf of a party whose interests are adverse to the interests of the plan members.

4.      The framework of prescription drug distribution, pricing, and reimbursement in the United States has become complex and opaque. Defendants have played a significant role in the development of this framework, having devised secret contracts with each entity involved in prescription drug distribution and reimbursement and ensured that none of these entities has information about prescription drug pricing outside of its individual contract. As a result, Defendants have placed themselves at the center of a prescription drug pricing black box and have exploited and profited from the resulting confusion and lack of awareness.

5.      However, Plaintiff's basic claim is simple. Defendants Optum, Inc.; OptumRx Holdings, LLC; OptumRx, Inc.; United HealthCare Services, Inc.; and UnitedHealth Group Incorporated are pharmacy benefit managers ("PBMs"). PBMs have fiduciary duties to members of the ERISA health insurance plans the PBMs help administer. Part of those fiduciary duties relate to the PBMs' administration of those plans' prescription drug benefits. Defendants breached their fiduciary duties to Plaintiff and the Class by administering those benefits in a manner designed to enrich themselves at the expense of Plaintiff and the Class.

6.      Specifically, Defendants entered into an arrangement with Mylan, N.V., who markets and sells EpiPen, under which Mylan was required to pay monies to Defendants each time they administered prescription drug benefits to a Class member filling an EpiPen prescription at a retail pharmacy. Defendants invoiced Mylan for these

2

monies based on a percentage of EpiPen's list price.  Thus, the more EpiPen prescriptions filled by Class members—and the more EpiPen's list price increased—the more monies Defendants received.

7.      Mylan paid these monies to Defendants in exchange for, among other things, (i) Defendants' placement of EpiPen on formularies—lists of prescription drugs for which Class members' health plans will provide prescription drug benefits; (ii) Defendants' exclusion of prescription drugs that compete with EpiPen from formularies; and (iii) Defendants' delivering a certain number of filled EpiPen prescriptions or EpiPen market share.

8.      Over the last several years, as the number of filled EpiPen prescriptions increased, so too have the monies that Mylan was required to pay Defendants.  This has perversely induced Mylan to continuously raise the list price of EpiPen in order to keep up with Defendants' invoices and maintain EpiPen's formulary placement and market share.  Indeed, Mylan and other pharmaceutical companies have recently admitted to doing so.    Moreover, pharmaceutical industry experts—including the current commissioner of the FDA—have recently acknowledged the perverse incentives that Defendants impose on Mylan.

9.      Defendants could have offered Mylan formulary placement and market share for EpiPen in exchange for lowering EpiPen's list price for the benefit of Plaintiff, Class members, and their ERISA health plans.  Instead, Defendants sought to profit based on the increasing list price—the price that Plaintiff and the Class are subject to at the pharmacy counter.  Moreover, Defendants retain substantial amounts of Mylan's

3

payments.  This misconduct has resulted in *massive revenue increases* for Defendants and *massive price increases* for the Class.  Defendants are liable under ERISA for this misconduct.

10.    Defendants' conduct has not only induced Mylan to increase the list price of EpiPen, it has had an enormous impact on EpiPen spending.  According to a recent analysis published by the Journal of the American Medical Association, between 2007 and 2014, total EpiPen spending increased astronomically, nearly 1,000%.  Further, the increase in EpiPen's benchmark price, induced by Defendants, has caused EpiPen deductible payments—the amount paid for EpiPen by Class members with annual health insurance deductibles—to increase by ***nearly 1,600%***, and EpiPen coinsurance payments—the amount paid for EpiPen by Class members with coinsurance—to increase by ***more than 1,500%***.

11.    Plaintiff's allegations are based on her own experience and personal knowledge, their research, the research of counsel, publicly available articles, studies, reports, and other sources, a reasonable inquiry under the circumstances, and on information and belief.  Plaintiff's allegations are likely to have further evidentiary support after a reasonable opportunity for further investigation and discovery.

## II.    PARTIES

### A.    Plaintiff

12.    Plaintiff Susan Illis ("Illis") is a resident of Marietta, Georgia.  Ms. Illis has a twelve-year-old daughter who has severe allergies to tree nuts.  Throughout the relevant time period, Ms. Illis has been a participant in an ERISA-governed health insurance plan.

4

Defendants provide pharmacy benefit management services to Ms. Illis under that plan. Ms. Illis' EpiPen purchase is detailed below in ¶ 138.

## B. Defendants

13.     Defendant Optum, Inc. is a pharmacy benefit manager headquartered at 11000 Optum Circle, Eden Prairie, Minnesota and incorporated in Delaware.  Optum, Inc., a subsidiary of United HealthCare Services, Inc., provides pharmacy benefit management services through its subsidiaries to various health insurance entities on behalf of more than 65 million plan members.  Timothy Alan Wicks, the Chief Financial Officer and Executive Vice President of Optum, Inc., is a director of OptumRx, Inc.

14.     Defendant United HealthCare Services, Inc. is headquartered at 9700 Health Care Lane, Minnetonka, Minnesota and incorporated in Minnesota.   United HealthCare Services, Inc., a subsidiary of UnitedHealth Group Incorporated, provides pharmacy benefit management services through its subsidiaries to various health insurance entities.   According to Exhibit 21.1 to the 2016 SEC Form 10-K of UnitedHealth Group Incorporated, United HealthCare Services, Inc. also does business as Optum.

15.     Defendant UnitedHealth Group Incorporated ("UnitedHealth") is headquartered at 9900 Bren Road East, Minnetonka, Minnesota and incorporated in Delaware.  UnitedHealth has two main divisions, United Healthcare, which provides health benefits, and Optum, which provides health services, including pharmacy benefit management services.  According to its 2016 Annual Report, "UnitedHealthcare utilizes Optum's capabilities to help coordinate patient care, improve affordability of medical

522446.1

care, analyze cost trends, manage pharmacy benefits, work with care providers more effectively and create a simpler consumer experience."   UnitedHealth's 2016 Annual Report further states, "OptumRx provides a full spectrum of pharmacy care services to more than 65 million people in the United States through its network of more than 67,000 retail pharmacies and multiple home delivery facilities throughout the country."   In 2016, approximately one-third of the overall revenues of UnitedHealth came from OptumRx, and OptumRx revenues almost doubled between 2014 and 2016, from $32 billion to $60 billion.  Larry Renfro, the Chief Executive Officer of Optum, Inc., is the Vice Chairman, Office of the Chief Executive, at UnitedHealth.  Tom Roos, the Senior Vice President and Chief Accounting Officer of UnitedHealth, is the Chief Financial Officer of United Healthcare Services, Inc.

16.     Defendant OptumRx Holdings, LLC, a Delaware limited liability corporation, is headquartered at 2300 Main Street, Irvine, California.   OptumRx Holdings, LLC is a pharmacy benefit manager and a subsidiary of Optum, Inc.  OptumRx Holdings, LLC provides pharmacy benefit management services through its subsidiaries to various health insurance entities.

17.     Defendant OptumRx, Inc. is a pharmacy benefit manager headquartered at 2300 Main Street, Irvine, California and incorporated in California.  OptumRx, Inc. is a subsidiary of OptumRx Holdings, LLC.   OptumRx, Inc. changed its name from Prescription Solutions, Inc. to OptumRx, Inc. in 2012.  OptumRx, Inc. provides pharmacy benefit management services to various health insurance entities.  Optum, Inc.; OptumRx Holdings, LLC; OptumRx, Inc. are agents and/or alter egos of United

6

HealthCare Services, Inc.  United HealthCare Services, Inc.; Optum, Inc.; OptumRx Holdings, LLC; OptumRx, Inc. are agents and/or alter egos of UnitedHealth.  OptumRx Holdings, LLC and OptumRx, Inc. are agents and/or alter egos of Optum, Inc.  OptumRx, Inc. is an agent and/or alter ego of OptumRx Holdings, LLC.  UnitedHealth; United Healthcare Services, Inc.; Optum, Inc.; OptumRx Holdings, LLC; and OptumRx, Inc. are collectively referred to as "Optum."

18.     On March 30, 2015, Optum announced its acquisition of another large pharmacy benefits manager, Catamaran Corporation, which at the time provided pharmacy benefit management services on behalf of 35 million plan members.  Optum announced the completion of the merger on July 23, 2015.

## III.     JURISDICTION AND VENUE

19.     The Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e), because Plaintiff's claims arise under ERISA.

20.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and (c), because each Defendant transacts business in, is found in, and/or has agents in the District of Minnesota, and because some of the actions giving rise to the complaint took place within this district.

21.     The Court has personal jurisdiction over each Defendant.  Defendant Optum, Inc. is headquartered in this judicial district, as is its parent, Defendant United HealthCare Services, Inc., and its parent, Defendant UnitedHealth Group Incorporated. Defendants administer the ERISA health insurance plan prescription drug benefits of many Class members in this judicial district.  Defendants enter into transactions with

7

numerous clients in this district, including employers that sponsor ERISA health plans and health insurers that provide ERISA health insurance plans, in which many Class members participate and that give rise to the fiduciary relationship and violations alleged herein.

## IV.    FACTUAL ALLEGATIONS

**A.    EpiPen**

22.    EpiPen is an auto-injector device designed to allow one to easily and safely administer the appropriate dosage of epinephrine in the event of an anaphylactic episode, a potentially life-threatening reaction to one or more allergens.  EpiPen can be used on oneself or on another person.  EpiPen is frequently used by parents and teachers to treat children experiencing an anaphylactic episode.

23.    Mylan N.V. ("Mylan") currently owns the rights to market and sell EpiPen. Mylan acquired those rights when, in 2007, Mylan acquired Merck KGaA, Merck's generic pharmaceutical business, which owned the rights at the time.  When Mylan acquired the rights to market and sell EpiPen, in 2007, the list price for a 2-Pak of the drug was less than $100.  By 2016, the list price for an EpiPen 2-Pak had skyrocketed to more than $608.  As of September 2017, Mylan's list price for an EpiPen 2-Pak remained at $608.61.



**Steep Climb**

The list price for a two-pack of the EpiPen has gone up steadily.

Source: Truven Health Analytics
**THE WALL STREET JOURNAL.**

24.    As EpiPen's price rose dramatically over the years, so did the number of EpiPen prescriptions, to 3.6 million in 2015 and more than 4.1 million in 2016.  Between 2013 and 2016, EpiPen occupied between 85% and 96% of the epinephrine autoinjector market.

25.    EpiPen users generally fill their prescriptions annually, given EpiPen's one-year expiration date.  In addition, EpiPen users often fill multiple prescriptions each year in order to have an EpiPen readily available in multiple places during a given day (*e.g.*, at home, in the car, at work, at school, etc.).  Approximately 70% of EpiPen prescriptions are filled using commercial health insurance with PBM-administered pharmacy benefits,[3]

---

[3]  Linda A. Johnson & Tom Murphy, *EpiPen maker increases copay, stands firm on high price*, Seattle Times (Aug. 25, 2016), http://www.seattletimes.com/nation-world/mylan-epipen/.

the vast majority of which are ERISA health insurance plans.[4]

26.     While Mylan has continuously raised the list price of EpiPen to more than $608, Mylan CEO Heather Bresch admits that Mylan's "cost of goods" for an EpiPen 2-Pak is $69.[5]  Likewise, industry experts estimate the cost to manufacture a single EpiPen to be approximately $20-$30.[6]  Notably, in other countries, the list price of EpiPen is shockingly lower than in the U.S.—just $69 in England,[7] less than $100 in France,[8] $100 in Australia,[9] between $100 and $145 in Canada,[10] and just over $200 in Germany.[11]

---

[4]   *Health Insurance Coverage of the Total Population – Timeframe: 2016*, The Henry J. Kaiser Family Foundation, State Health Facts, http://www.kff.org/other/state-indicator/total-population/?currentTimeframe=0&selectedDistributions=employer--non-group&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D (last visited Sept. 25, 2017).

[5]   Dan Mangan, *Mylan's EpiPen 'greed is astounding ... sickening and disgusting,' rep says,* CNBC (Sept. 21, 2016), https://www.cnbc.com/2016/09/21/mylan-ceo-says-epipen-profits-no-where-near-devices-600-sticker-price.html.

[6]   Ben Popken, *Industry Insiders Estimate EpiPen Costs No More Than $30*, NBC News (Sept. 6, 2016), https://www.nbcnews.com/business/consumer/industry-insiders-estimate-epipen-costs-no-more-30-n642091.

[7]   James Paton & Naomi Kresge, *Why the $600 EpiPen Costs $69 in Britain*, Bloomberg (Sept. 28, 2016), https://www.bloomberg.com/news/articles/2016-09-29/epipen-s-69-cost-in-britain-shows-other-extreme-of-drug-pricing-itnvgvam.

[8]   *Id.*

[9]   Sophie Scott & Rebecca Armitage, *Mylan EpiPen US price hikes unlikely to be experienced in Australia, experts say*, ABC News (Aug. 24, 2016), http://www.abc.net.au/news/2016-08-25/mylan-epipen-us-prices-hikes-unlikely-to-happen-in-australia/7784700.

[10]   Gillian Mohney, *EpiPen Price Hike Prompts Some US Families to Buy the Drug in Canada*, ABC News (Aug. 31, 2016), http://abcnews.go.com/Health/epipen-price-hike-prompts-us-families-buy-drug/story?id=41769704.

[11]   Paton & Kresge, *Why the $600 EpiPen Costs $69 in Britain*, *supra*, https://www.bloomberg.com/news/articles/2016-09-29/epipen-s-69-cost-in-britain-shows-other-extreme-of-drug-pricing-itnvgvam.

**B.      Prescription Drug Distribution and Reimbursement**

27.     PBMs are at the center of the complex and opaque system of prescription drug distribution and reimbursement in the United States.   PBMs enter into separate contracts with pharmaceutical companies, retail pharmacies, health insurers, employers, unions, and governmental entities that dictate pricing, reimbursement, coverage, and availability for prescription drugs.

### 1.      *The Prescription Drug Distribution Chain*

28.     *Pharmaceutical Companies*.   Pharmaceutical companies, also referred to herein as "drug companies," develop, manufacture, market, and sell drugs.   At the beginning of the prescription drug distribution chain, pharmaceutical companies sell prescription drugs to drug wholesalers.   Mylan is the pharmaceutical company that markets and sells EpiPen.   As discussed further below, PBMs enter into contracts with pharmaceutical companies for retrospective rebates and other monies.

29.     *Wholesalers.*   Drug wholesalers purchase bulk quantities of drugs directly from drug companies to distribute to pharmacies and hospitals.   For example, a wholesaler may fill an order from a pharmacy for a specified quantity of drugs from one or more drug companies and deliver the order to the pharmacy.   Three wholesalers— AmerisourceBergen Corporation, Cardinal Health Inc. and McKesson Corporation— account for over 85% of all drug distribution in the United States.

30.     *Retail Pharmacies*.   Retail pharmacies typically purchase pharmaceuticals from wholesalers to dispense to consumers.   Retail pharmacies include chain pharmacies (*e.g.* Walgreens, CVS, Walmart, and Costco), pharmacies in grocery stores and other

522446.1

retailers, hospitals, and independently owned pharmacies. Each of the Defendants has entered into contracts with chain pharmacies, grocery store and other retailers' pharmacies, Pharmacy Services Administrative Organizations ("PSAOs"),[12] and a small number of individual pharmacies to dispense drugs to their clients' plan members, including Class members.

31.    In short, at the retail level, prescription drugs, including EpiPen, have the following chain of distribution between the drug company and the ultimate patient-consumer: (i) the drug company sells the drug to a wholesaler; (ii) the wholesaler sells the drug to a pharmacy or other drug dispensary; and (iii) the pharmacy dispenses the drug to the patient-consumer.

### 2.    *The Prescription Drug Reimbursement Chain*

32.    *PBMs.*    The prescription drug reimbursement chain is essentially controlled by PBMs. PBMs enter into confidential contracts with employers and other employer-relates entities (like unions), health insurers, federal and state governments, municipalities, and prescription drug coalitions to manage and administer prescription drug benefits for health plan members, including the Class, in exchange for various fees. According to the Pharmaceutical Care Management Association, as of 2016, PBMs administer prescription drug benefits for 266 million Americans. The four largest

---

[12]    PSAOs serve as intermediaries between PBMs and independent pharmacies to negotiate reimbursement rates, among other things. Independent pharmacies join a PSAO in the hopes that the PSAO—with membership ranging between hundreds of independent pharmacies to thousands—will be able to negotiate more favorable terms with PBMs on behalf of their members collectively than the pharmacies could alone. Nearly all independent pharmacies are members of a PSAO.

PBMs—Express Scripts,[13] CVS Caremark,[14] Optum, and Prime Therapeutics, LLC ("Prime")—administer prescription drug benefits for more than 200 million Americans.

33.    *Health Insurers.*   Health insurers offer health insurance plans, which typically include medical and prescription drug benefits.   Individuals and entities, such as employers, purchase health insurance plans through the payment of premiums, typically on a monthly basis.

34.    *Prescription Drug Coalitions.*   Prescription drug coalitions are entities that serve as intermediaries between PBMs and employers.   Prescription drug coalitions are formed and managed by healthcare consulting firms, such as Willis Towers Watson, Aon, PLC, and Mercer LLC.   Many employers join a prescription drug coalition—with membership ranging between dozens of employers to hundreds—in the hopes that the coalition will negotiate more favorable pharmacy benefit service contracts with PBMs on behalf of the coalition's members collectively than individual employers could negotiate on their own.

35.    *Employer Health Insurance Plans.*   Employers may sponsor a health insurance plan in one of two ways.[15]   First, an employer may purchase a health insurance plan from a health insurer, and the health insurer provides healthcare benefits (*i.e.*, medical and prescription drug benefits) to employees.   The plan's health insurer will

---

[13] Express Scripts Holding Company; Express Scripts, Inc.; and Medco Health Solutions, Inc. are collectively referred to as "Express Scripts."

[14] CVS Health Corporation; Caremark, L.L.C.; Caremark Rx, L.L.C.; and CaremarkPCS Health, L.L.C. are collectively referred to as "CVS Caremark."

[15] A union may sponsor a health insurance plan for its members in the same way as an employer.

522446.1

contract with a specific PBM to administer the plan's prescription drug benefits. Second, an employer may set aside funds to directly provide healthcare benefits to employees, paying for their medical and prescription drug benefits itself. Such employers contract with a health insurer to administer healthcare benefits on behalf of the employer's health insurance plan. Either the plan's health insurer will contract with a PBM to administer the plan's prescription drug benefits, or the employer will contract with a specific PBM, either through a prescription drug coalition or directly, to administer the plan's prescription drug benefits.

36. *Retail Pharmacies.* PBMs do not take possession or control of prescription drugs that are dispensed at retail pharmacies. Instead, PBMs create networks of retail pharmacies—for example, a group of chain pharmacies or one or more PSAOs—and enter into contracts with those networks to reimburse individual retail pharmacies for dispensing prescription drugs, like EpiPen, to health plan members with PBM administered prescription drug benefits. PBMs mandate that these reimbursement contracts, including the rates of reimbursements to retail pharmacies for dispensing prescription drugs, be kept secret. Separately, PBMs enter into secret contracts with health insurers, employers, and unions (collectively referred to as "Third-Party Payers") regarding reimbursement rates for prescription drugs from the Third-Party Payer to the PBM.

37. When an individual plan member presents a prescription at a pharmacy, the pharmacy transmits the prescription information to the PBM. This is known as a prescription drug benefit claim. The PBM then sends a message back to the pharmacy

indicating whether the individual is eligible for prescription drug benefits for that claim and, if so, (1) the amount the pharmacy will be reimbursed by the PBM for dispensing the drug, and (2) the amount the pharmacy must collect from the individual.   Thus, in administering prescription drug benefits, PBMs adjudicate (i) health plan members' eligibility for prescription drug benefits; (ii) the amount of prescription drug benefits to be provided to health plan members, in the form of a reimbursement of some or all of the cost of a prescription drug; and (iii) health plan members' cost-sharing obligations.

38.    In short, PBMs process prescription drug benefit claims and reimburse pharmacies for those claims, pursuant to a secret reimbursement rate between the PBM and the pharmacy.   Third-Party Payers then reimburse their respective PBMs for those same prescription drug benefit claims, pursuant to another secret reimbursement rate between the PBM and the Third-Party Payer.   A simplified version of this reimbursement chain, as well as the previously discussed drug distribution chain, is graphically depicted below.

522446.1



### C. Defendants Exploit Their Position at the Hub of Prescription Drug Reimbursement to Enrich Themselves

39.     Defendants' position at the hub of prescription drug reimbursement—entering into separate agreements with Third-Party Payers and retail pharmacies—has allowed Defendants to enrich themselves in the face of list price increases for drugs like EpiPen through spread pricing and manipulation of pharmacy reimbursement rates.

#### 1. *PBM Reimbursement Contracts with Third-Party Payers*

40.     PBMs enter into one of two types of drug reimbursement contracts with their Third-Party Payer clients: (i) a "Spread Pricing Contract," which allows the PBM to charge their Third-Party Payer a greater amount for the drug than the PBM reimburses the retail pharmacy, thereby making a profit "spread" on the drug; or (ii) a "Pass-Through

Pricing Contract," which requires the PBM to pass through to the health plan the PBM's actual rate of reimbursement to the pharmacy.

41.    The amounts that PBMs reimburse pharmacies, and the amounts that Third-Party Payers reimburse PBMs, are kept secret.  Only a drug's Average Wholesale Price ("AWP") and Wholesale Acquisition Cost ("WAC") are publicly reported.  AWP is a benchmark price that is published in pharmaceutical price indexes.  WAC, a related benchmark price, also known as the list price, is the price at which drug companies sell drugs like EpiPen to wholesalers.  A given drug's AWP is based on its WAC plus an average markup of 20%.

42.    In general, AWP or WAC is the starting point in determining reimbursement rates for drugs, including EpiPen.  For a given drug, like EpiPen, pharmacies are generally reimbursed an amount between the drug's AWP and WAC. Under a Spread Pricing Contract, a PBM might reimburse a pharmacy for brand name drugs at AWP minus 15%, while the Third-Party Payer might reimburse the PBM for brand name drugs at AWP minus 12%.[16]  The PBM will keep the 3% spread as profit.  If these reimbursements were instead based on WAC, the PBM would reimburse the pharmacy at WAC plus 6.25%, the Third-Party Payer would reimburse the PBM at WAC plus 10%, and the PBM would keep the 3.75% spread as profit.

43.    Under the same spread pricing terms, for a drug with a WAC of $300 and

---

[16]    Pharmacy reimbursements also account for plan member cost-sharing obligations.  For example, if a plan member is required to pay $50 out-of-pocket to the pharmacy when filling a particular prescription, the PBM would reimburse the pharmacy AWP minus 15% minus $50.

an AWP of $360, under AWP-based reimbursement, the PBM would reimburse the pharmacy $306, the Third-Party Payer would reimburse the PBM $316.80, and the PBM would keep $10.80.  Under WAC-based reimbursement, the PBM would reimburse the pharmacy $318.75, the Third-Party Payer would reimburse the PBM $330, and the PBM would keep $11.25.  If the drug price doubled to a WAC of $600 and an AWP of $720, the PBM's take would also double to $21.60 under AWP-based reimbursement and $22.50 under WAC-based reimbursement.

### AWP to WAC Conversion Chart[17]

Converting from an AWP discount to a WAC based discount*

| AWP Discount | WAC Plus Equivalent |
| --- | --- |
| 12.00% | 10.00% |
| 12.50% | 9.38% |
| 13.00% | 8.75% |
| 13.50% | 8.13% |
| 14.00% | 7.50% |
| 14.50% | 6.88% |
| 15.00% | 6.25% |
| 15.50% | 5.62% |
| 16.00% | 5.00% |
| 16.50% | 4.38% |
| 17.00% | 3.75% |
| 17.50% | 3.13% |
| 18.00% | 2.50% |
| 18.50% | 1.88% |
| 19.00% | 1.25% |
| 19.50% | 0.63% |
| 20.00% | 0.00% |

*The conversion chart is compliments of Pharmacy Providers of Oklahoma (PPOk). http://www.ppok.com/

---

[17]    *Converting from an AWP discount to a WAC equivalent discount*, National Community Pharmacists Association, https://www.ncpanet.org/pdf/fdbinfosheet.pdf (last visited Sept. 25, 2017).

44.     Thus, under a Spread Pricing Contract, as the benchmark price of drugs like EpiPen increases, so too does the dollar amount of spread that Defendants keep for themselves.

### 2. PBM Reimbursement Contracts with Retail Pharmacies

45.     While a PBM enters into a single drug reimbursement contract with a given Third-Party Payer client, the PBM will often enter into multiple reimbursement contracts with a given pharmacy network, each with varying reimbursement rates.[18]  For example, one contract might reimburse the network's pharmacies at AWP minus 12% for brand name drugs like EpiPen, a second contract might reimburse the pharmacies at AWP minus 15%, and a third might reimburse the pharmacy at AWP minus 18%.

46.     Defendants' pharmacy reimbursement contracts are wholly confidential and mandate that their terms are not disclosed to anyone outside the pharmacy, including Defendants' Third-Party Payer clients and health plan members.  Indeed, the contracts themselves typically provide that disclosure of their terms is grounds for termination of the contractual relationship.  Consequently, when a health plan member fills a prescription for a drug like EpiPen at a network retail pharmacy, the Defendants have the discretion to choose their reimbursement rate to the pharmacy from their various reimbursement contracts—in effect, controlling both the amount of reimbursement for

---

[18]  Henry C. Eickelberg, *The Prescription Drug Supply Chain "Black Box" - How it Works and Why You Should Care*, American Health Policy Institute (2015), http://www.americanhealthpolicy.org/Content/documents/resources/December%202015_AHPI%20Study_Understanding_the_Pharma_Black_Box.pdf, at 12.

drugs like EpiPen and the amount of spread that Defendants can keep for themselves.[19]

When issuing reimbursements under a Spread Pricing Contract, Defendants are able to

choose their pharmacy reimbursement contract with the lowest reimbursement rate (*e.g.*,

AWP minus 18%), which allows Defendants to retain increased spread.[20]

47.     Defendants' discretion over pharmacy reimbursement rates also allows

them to control the price that Class members pay for EpiPen at retail pharmacies because,

as discussed in detail below, standard health plan terms dictate that the price a Class

member pays for EpiPen is based on the contractual reimbursement rate between

Defendants and their retail pharmacy networks.  Class members whose plans have a Pass-

Through Pricing Contract with Defendants often pay more out-of-pocket for EpiPen

because Defendants are able to choose their pharmacy reimbursement contract with the

highest reimbursement rate (*e.g.*, AWP minus 12%).[21]  Defendants do so because they

cannot create or retain any spread under a Pass-Through Pricing Contract.

**D.     PBMs' "Rebate" Game and Skyrocketing Prescription Drug Prices**

48.     In addition to the secret contracts between PBMs, Third-Party Payers, and

retail pharmacies, PBMs enter into secret contracts with drug companies, including

Mylan, pursuant to which the drug company pays monies to the PBM in exchange for

increasing consumer access to and/or market share for their prescription drugs, among

other things.  These payments are directly tied to the individual EpiPen prescriptions

---

[19]  *See* Linda Cahn, *Eliminate All PBM Contract Loopholes*, Benefits Magazine
(October 2013), http://www.ifebp.org/inforequest/0164413.pdf.

[20]  *Id.*

[21]  *Id.*

filled by Class members and directly contribute to the increased out-of-pocket costs to Class members.

### 1. *Rebates Generally*

49.    A common label assigned to monies received by a PBM from a drug company is a "rebate."  Rebates are payments that PBMs solicit from drug companies—calculated as a percentage of the AWP or WAC of brand name drugs—in exchange for, among other things, placement on **"*formularies*."**  A formulary is a list of drugs for which PBMs' Third-Party Payer clients offer prescription drug benefits to plan members. Rebates are paid pursuant to one or more secret rebate agreements between the drug company and the PBM.

50.    PBMs assign a variety of labels to rebates, including "access rebates," "formulary rebates," "base formulary rebates," "market share rebates," and "performance rebates," among others.

51.    In their contracts with Third-Party Payer clients, PBMs often agree to pass back 80%-100% of some form of specified rebates, typically "formulary rebates" or "base formulary rebates."  PBMs market this passing back of rebates as a means of achieving significant discounts off the cost of prescription drugs, like EpiPen, for their Third-Party Payer clients.  However, as discussed further below, in their contracts with drug companies, PBMs, including Defendants, are paid not only the rebates specified in their agreements with Third-Party Payers, but other types of rebates, as well as many other types of payments.  As a result, Defendants secretly collect—and retain—large amounts of monies in a shell game: they simply label drug company payments differently

21

in their contracts with drug companies than they label those same payments in their contracts with their Third-Party Payer clients.[22]

### 2.   *Rebates Heavily Influence Formularies*

52.     PBMs create and/or manage their Third-Party Payer clients' formularies in exchange for various fees.  Most formularies have multiple tiers of coverage.  The tier in which a drug is placed determines the amount of prescription drug benefits provided for the drug.  As discussed below, plan members typically pay less out-of-pocket for drugs in preferred formulary tiers.  If a drug is not listed on the formulary, most health plans will not cover the drug at all.

53.     Given that formularies are determinative of prescription drug benefits, PBMs successfully use formularies to steer plan members toward certain brands of drugs over others.  PBM formularies favor certain drugs over others based on safety, efficacy, and cost (*i.e.*, the amount of rebates and other monies paid by the drug company to the PBM).

### a.   Market Consolidation and the Rise of Exclusionary Formularies

54.     Over the past several years, PBMs have successfully extracted enormous rebates from prescription drug companies, including Mylan, for two principal reasons.  First, since 2007, PBMs began consolidating into what are now four major entities— Express Scripts, CVS Caremark, Optum, and Prime—that administer prescription drug

---

[22] Linda Cahn, *Message from Mylan: It's Time For Every Health Plan To Address Rebate Issues*, National Prescription Coverage Coalition (NPCC), http://nationalprescriptioncoveragecoalition.com/message-from-mylan-its-time-for-every-health-plan-to-address-rebate-issues/ (last visited Sept. 25, 2017).

benefits for more than 200 million Americans.  Consequently, for drug companies, including Mylan, the formularies established by Express Scripts, CVS Caremark, Optum, and Prime are the exclusive gateway to the vast majority of the prescription drug market.

55.     Second, these PBMs operate what are known as closed formularies.  Up until approximately 2012, PBMs devised and managed what are known as open formularies—formularies that offer prescription drug benefits for virtually all available FDA-approved drugs to varying degrees.  Consequently, in an open formulary scheme, drug companies compete to have their drugs placed into the most favorable formulary tier possible.

56.     In recent years, closed formularies have become more common.  Closed formularies similarly provide tiered benefits, but also restrict the overall number of drugs covered.  Closed formularies cause drug companies to compete not only for favorable tier placement, but simply to have their drugs appear on the PBM formularies in the first place, and thus to have access to significant swathes of the American prescription drug market.

57.     In addition to the increase in percentage of closed formularies, beginning in 2013, PBMs have increased the number of drugs excluded from their standard formularies year-over-year.  Indeed, while formulary exclusions of brand name drugs have always existed in narrowly-defined circumstances,[23] as *Managed Care Magazine*

---

[23]   For example, drugs that are found to be unsafe have been excluded from formularies.  In addition, certain highly specialized prescription drug plans, such as those that cover exclusively generic drugs, will inevitably exclude a significant number of drugs.

522446.1

stated in its April 2015 issue, "[o]ver the past 18 months, the use of formulary exclusions has changed from being a targeted tactic to a commonly used weapon."[24]   CVS Caremark's exclusions from its standard formulary increased from 72 in 2014 to 95 in 2015, 124 in 2016, and 154 in 2017.   Express Scripts' exclusions from its standard formulary increased from 48 in 2014 to 66 in 2015, 87 in 2016, and held steady at 85 in 2017.   In 2014, prior to its acquisition by Optum, Catamaran excluded 54 drugs from its Value Formulary, and Optum's exclusions from its standard formulary increased from 77 in 2016 to 83 in 2017.   Prime likewise expanded exclusions over these years.

58.   Formulary exclusions generally occur where multiple drugs are deemed therapeutically interchangeable, as has been the case with epinephrine auto-injectors like EpiPen.   Indeed, in a 2015 AIS Health presentation, entitled "PBM Formulary Exclusions: Bottom-Line Strategies for Health Plans"[25] ("the AIS Presentation"), Express Scripts' Senior Director of Formulary Development and Appeals noted that in the context of "products you can clinically interchange," the company looks "at the financial aspects, including the net cost of the product [and] rebates. . . ."   Similarly, the Pharmaceutical Care Management Association (PCMA)—Defendants' Washington, DC based lobbying organization—states that "[i]n classes where several products may be considered therapeutically equivalent, PBMs can negotiate with drug manufacturers for higher

---

[24] Thomas Reinke, *PBMs Just Say No to Some Drugs—But Not to Others*, Managed Care Magazine April 2015, https://www.managedcaremag.com/archives/2015/4/pbms-just-say-no-some-drugs-not-others (last visited Sept. 25, 2017).

[25]   David Dross & Jeff Eichholz, *PBM Formulary Exclusions: Bottom-Line Strategies for Health Plans*, AIS's (Atlantic Information Services, Inc.) Management Insight Series (2015), https://aishealth.com/sites/all/files/gc5p02_01-15.pdf.

rebates[.]"[26]

59.     The threat of formulary exclusion is a major factor in rebate transactions between the four major PBMs and drug companies.  Indeed, in April 2015, Express Scripts' Chief Medical Officer told *Managed Care Magazine* that formulary exclusions "demonstrate that PBMs could move market share."[27]  He further touted that drug companies "[are] now convinced . . . that we [can] actually deliver market share when we [are] motivated to.  So we went to the companies, and we told them, 'We're going to be pitting you all against each other.  Who is going to give us the best price?  If you give us the best price, we will move the market share to you.  We will move it effectively.  We'll exclude the other products.'"[28]

60.     Industry experts have highlighted that the threat of formulary exclusion has yielded substantial rebates for PBMs from drug companies.  In the AIS Presentation, Arthur Shinn of Pharmacy Consultants, LLC states that "[t]he exclusion strategy is a big rebate revenue generator."  Likewise, Craig Oberg of the Burchfield Group explained that "[t]he savings generated through exclusions is . . . more about preserving manufacturer rebates."

61.     As PBMs have extracted larger and larger rebates and other monies from

---

[26] *Drug Price Negotiations & Rebates*, Pharmaceutical Care Management Association (PCMA), https://www.pcmanet.org/policy-issues/drug-price-negotiations-rebates/ (last visited Sept. 25, 2017).

[27] Peter Wehrein, *A Conversation With Steve Miller, MD: Come in and Talk With Us, Pharma*, Managed Care Magazine April 2015, https://www.managedcaremag.com/archives/2015/4/conversation-steve-miller-md-come-and-talk-us-pharma (last visited Sept. 25, 2017).

[28] *Id.*

522446.1

drug companies over the last several years, their revenues have soared.  Between 2010 and 2016, Express Scripts' revenue jumped from approximately $45 billion to north of $100 billion.  Optum's revenue increased from roughly $32 billion in 2014 to more than $60 billion in 2016.  CVS Health's Pharmacy Services Segment saw revenues climb from $76 billion in 2013 to more than $120 billion in 2016.  Prime's revenues rose from $1.8 billion in 2012 to $4.73 billion in 2016.

62.    Despite their massive revenues, Defendants purport to have relatively slim profit margins.  According to a March 31, 2017 article in *Bloomberg*,[29] Express Scripts, CVS Caremark, and Optum, "[t]he three big middlemen for prescription drugs, . . . had operating-profit margins last year of 4 percent to 7 percent."  However, "[w]ere they to tally their revenue the way many middlemen in other industries do, their margins would more than double."  Industry experts told *Bloomberg* that "booking revenue in a way that shows lower margins might have helped the companies deflect criticism of their pricing practices.  'It hides a lot. It's as simple as that,' said Ravi Mehrotra, a partner at the MTS Health Partners investment bank."[30]

b.    Adoption of Formulary Exclusions by Third-Party Payers

63.    Approximately once a year, PBMs design lists of formulary exclusions to offer their Third-Party Payer clients.  Adopting these exclusion lists allows Third-Party Payers to receive drug company rebates, while failing to adopt exclusion lists results in

---

[29]  Tom Metcalf & Neil Weinberg, *Drug Middlemen Have Slim Profit Margins -- Just Ask Them*, Bloomberg Technology (Mar. 31, 2017) https://www.bloomberg.com/news/articles/2017-03-31/drug-middlemen-have-slim-profit-margins-just-ask-them.

[30]  *Id.*

receipt of little to no rebates.  Therefore, Third-Party Payers face tremendous pressure to adopt their PBMs' formulary exclusions or risk subjecting themselves to the full benchmark price of expensive drugs like EpiPen.  As David Dross of Mercer LLC stated during the AIS Presentation, "that's not really a choice."

64.     PBMs give their Third-Party Payer clients very short timeframes— sometimes as little as two weeks—in which to adopt or reject formulary exclusions.  According to Dross, this "tactic makes plan sponsors feel like the PBMs are mandating plan coverage rules."  In many instances, PBM agreements require Third-Party Payers to adopt formulary exclusions unless they notify their PBM prior to implementing those exclusions.

65.     In addition, in many instances, if a Third-Party Payer adopts formulary exclusions for a given year, their PBM contract makes it difficult to opt out of exclusions in subsequent years.  As Express Scripts spokesperson David Whitrap noted in the AIS Presentation, "[t]hat would require a contract addendum and readjusted rebate guarantees."

66.     Moreover, Third-Party Payers often contractually outsource the development and/or management of their formularies to their PBM in the first place.  As David Dross mentioned during the AIS Presentation, "[b]ecause most employers don't have clinicians on staff, they don't even question their PBM's formulary, much less design their own."  Likewise, Cottingham & Butler, a national insurance broker, noted in a client presentation regarding the dynamics between PBMs and health plans that PBMs have "unilateral control . . . over formularies and tiering—driving greater profits for

PBMs through rebates[.]"[31]   Moreover, once a plan adopts a formulary, the PBM generally retains discretion to alter it at any time, including with respect to tiering and drug exclusions.   As a result, in most cases, the PBM effectively decides which drugs appear on those Third-Party Payers' formularies and which are excluded.

### 3.   *Inflation Protection Rebates*

67.   More recently, contracts between PBMs, including Defendants, and drug companies have included what are known as "inflation protection" rebates or "price protection" rebates.   These provisions allow Defendants to collect large amounts of money when a drug company increases the list price of a given drug past a certain threshold.

68.   For example, an inflation protection rebate provision might set a 5% threshold.   If the drug company raises the list price for a drug by less than 5% within a particular timeframe (for example, one year), it need not pay anything.   If the drug company raises the list price by more than 5%, the drug company is then required to pay a specific percentage of the revenue that it earns from that list price increase to the PBM.[32]

69.   Therefore, like other rebates and administrative fees, inflation protection rebate provisions allow PBMs to profit from benchmark price increases.   For example, Express Scripts recently became embroiled in a lawsuit with Kaleo, Inc.   Kaleo is the

---

[31]   Nancy Daas - Presenter, *Prescription Drug Plan Strategies*, Cottingham & Butler (2017), http://www.cottinghambutler.com/wp-content/uploads/2017/03/Prescription-Drug-Strategies.pdf.

[32]   Craig Metz, *What is Price Protection*, High Point Solutions (May 16, 2017), http://blog.highpointsolutions.com/what-is-price-protection.

manufacturer of an auto-injector device called Envizio that is used to reverse the effects of an opioid overdose.  In the lawsuit, Express Scripts alleges that the parties entered into an agreement where Kaleo agreed to pay (i) "formulary rebates;" (ii) manufacturer "administrative fees;" and (iii) "price protection rebates" related to Envizio.  Complaint, *Express Scripts, Inc. et al. v. Kaleo, Inc.*, No. 17-cv-1520 (E.D. Mo. May 16, 2017) (the "ESI/Kaleo Lawsuit").

70.    While Express Scripts' lawyers redacted most of the core paragraphs of the ESI/Kaleo Lawsuit complaint, a few un-redacted paragraphs reveal that in just four months, Express Scripts invoiced Kaleo for approximately $26,000 in "formulary rebates;" approximately $363,000 in manufacturer "administrative fees;" and approximately $8.425 million in "price protection rebates."  Moreover, as shown in the table below,[33] when the list price of Envizio, shot up from $937.50 per unit to $4,687.50 per unit, Express Scripts stood to massively profit, as its invoices for "price protection rebates," exploded from just under $5,200 to nearly $5 million.

---

[33]    Table summarizing ESI/Kaleo Complaint allegations taken from Linda Cahn, *Express Scripts Lawsuit Should Raise Everyone's Eyebrows*, National Prescription Coverage Coalition (NPCC), http://nationalprescriptioncoveragecoalition.com/express-scripts-lawsuit-should-raise-everyones-eyebrows/ (last visited Sept. 25, 2017).

| Invoice Date | Type of Contract | Formulary Rebate | Admin Fee | Price Protection Rebate | Total |
|---|---|---|---|---|---|
| Jan-16 | Commercial | $1,612.50 | $24,963.90 | $5,689.26 | $32,265.66 |
| Jan-16 | Medicare | $450 | $2,652.13 | $5,184.14 | $8,286.57 |
| 2/1/16: kaleo increases Evzio list price from $937.50 to $4,687.50 | | | | | |
| Apr-16 | Commercial | $7,125.00 | $129,517.29 | $4,951,923.90 | $5,088,566.19 |
| May-16 | Commercial | $9,937.50 | $137,162.51 | $2,266,092.01 | $2,413,192.02 |
| Dec-16 | Commercial | $4,312.50 | $56,395.65 | $977,873.22 | $1,038,581.37 |
| Dec-16 | Medicare | $3,375 | $12,468.56 | $219,218.80 | $235,062.36 |
| | Total | $26,812.50 | $363,160.04 | $8,425,981.33 | $8,815,954.17 |

## 4. *Administrative Fees*

71.     In addition to rebates, drug companies often pay PBMs substantial amounts of various "administrative fees" in exchange for, among other things, transmitting data automatically generated by the PBMs' computer systems about a drug's utilization.[34] This information provides useful market data to drug companies, including whether their financial agreements with PBMs are in fact increasing their drug's market share.

72.     As CVS states in its 2016 SEC Form 10-K, it "receives fees from pharmaceutical manufacturers for administrative services."  Likewise, in its 2016 SEC

---

[34]  Eickelberg, *The Prescription Drug Supply Chain "Black Box" - How it Works and Why You Should Care*, *supra*, http://www.americanhealthpolicy.org/Content/documents/resources/December%202015_AHPI%20Study_Understanding_the_Pharma_Black_Box.pdf; *see also* Linda Cahn, *It's Time To Determine How Much Your PBM Is Depriving Your Plan Of Rebates: File An "Accounting" Procedure*, National Prescription Coverage Coalition (NPCC), http://nationalprescriptioncoveragecoalition.com/its-time-to-determine-how-much-your-pbm-is-depriving-your-plan-of-rebates-file-an-accounting-procedure/ (last visited Sept. 25, 2017).

Form 10-K, Express Scripts states that it receives "administrative fees [from drug companies] earned for the administration of our rebate programs, performed in conjunction with claims processing services[.]"  Express Scripts' 2016 SEC Form 10-K also notes that it receives administrative fees from drug companies "in conjunction with formulary management services."  Similarly, in its 2016 SEC Form 10-K, UnitedHealth states that it derives revenues from, *inter alia*, "fees from management, administrative, technology and consulting services."  In its 2015 SEC Form 10-K, Catamaran states that it "administers rebate programs through which it receives rebates and administrative fees from pharmaceutical manufacturers . . ."  In a 2014 press release issued by Prime to tout its low net cost per prescription, "Prime defines net cost per prescription as the total amount paid for drugs, including manufacturer rebates and administrative fees. . . ."[35]

73.     Notably, Medco's 2011 SEC Form 10-K states that it received nearly $528 million in administrative fees (termed "manufacturer service revenue") in 2011 alone, up from $158 million in 2009.  UnitedHealth, Express Scripts, and CVS Caremark do not disclose the amount of administrative fees received from drug companies in public filings.

74.     Like rebates, the dollar amount of administrative fees that Defendants invoice drug companies for a drug are calculated as a percentage of the benchmark price of that drug.  For example, in an "Express Scripts Financial Disclosure" attached to a

---

[35]  Press Release, Prime Therapeutics, *Prime Therapeutics' 2013 overall net cost per prescription of $58.99 is industry-low for third consecutive year* (June 17, 2014), https://www.primetherapeutics.com/content/dam/corporate/Documents/Newsroom/Pressreleases/2014/Press_Release_-_Prescription_Cost_Report_FINAL.pdf.

rare, publicly available PBM service agreement, Express Scripts discloses that it performs administrative services that "include, for example, maintenance and operation of the systems and other infrastructure necessary for managing and administering the PBM formulary rebate process and access to drug utilization data . . . for purposes of verifying and evaluating the rebate payments and for other purposes related to the manufacturer's products."[36]  Thereafter, Express Scripts discloses that its "administrative fees are calculated based on the price of the rebated drug or supplies along with the volume of utilization and do not exceed the greater of (i) 4.58% of the average wholesale price [AWP], or (ii) 5.5% of the wholesale acquisition cost [WAC] of the products."[37]  CVS Caremark, Prime, and Optum calculate manufacturer administrative fees in the same manner.

75.    Thus, when a drug's benchmark price increases or the number of filled prescriptions for the drug increases, so does the dollar amount in "administrative fees" that Defendants collect.  And given that administrative fees are based on the benchmark price of a drug or the work automatically performed by Defendants' computer systems, no rational relationship exists between the dollar amount of drug company administrative

---

[36]  *See* Michigan County Contract with Express Scripts, attached to Genesee County Board of Commissioners Public Works Agenda (Mar. 9, 2015), available at *http://nationalprescriptioncoveragecoalition.com/wp-content/uploads/2017/07/WebPage.pdf*, at p. 28.  *See also* Cahn, *It's Time To Determine How Much Your PBM Is Depriving Your Plan Of Rebates:  File An "Accounting" Procedure*, National Prescription Coverage Coalition (NPCC), *supra*, *http://nationalprescriptioncoveragecoalition.com/its-time-to-determine-how-much-your-pbm-is-depriving-your-plan-of-rebates-file-an-accounting-procedure/*.

[37]  *Id.*

32

fees and the work performed by Defendants.[38]

76.     Administrative fees may, at times, exceed the value of the payments denominated as "rebates," as Express Scripts has acknowledged in the ESI/Kaleo Lawsuit.   There, Express Scripts and Kaleo entered into rebate agreements by which Kaleo paid a mixture of "rebates" and "administrative fees" to Express Scripts related to Envizio.  As detailed in Express Scripts' complaint, Express Scripts, on certain occasions, invoiced Kaleo for "administrative fees" that vastly exceeded the value of rebates purportedly secured for Third-Party Payer clients.   For example, in January 2016, Express Scripts invoiced Kaleo for nearly $25,000 in "administrative fees" but only just over $7,300 in total rebates.  And when Envizio's WAC shot up, on February 1, 2016, from $937.50 to $4,687.50, so did these "administrative fees," to nearly $130,000 in April 2016 and more than $137,000 in May 2016.   ESI/Kaleo Lawsuit, ¶¶ 56, 59, 60.

   **5.     *The Lack of Transparency into PBM Contracts with Drug Companies Allows PBMs to Retain Substantial Amounts of Rebates, Administrative Fees, and Other Monies***

77.     PBMs boast that aggressive rebates yield significant savings for their Third-Party Payer clients.  Indeed, as previously noted, in their contracts with Third-Party Payer clients, PBMs often agree to pass back 80%-100% of some form of specified rebates, typically "formulary rebates" or "base formulary rebates."[39]  However, in their contracts with drug companies, PBMs, including Defendants, are paid not only the rebates

---

   [38] *Id.*

   [39] Cahn, *It's Time To Determine How Much Your PBM Is Depriving Your Plan Of Rebates:  File An "Accounting" Procedure*, National Prescription Coverage Coalition (NPCC), *supra*,  http://nationalprescriptioncoveragecoalition.com/its-time-to-determine-how-much-your-pbm-is-depriving-your-plan-of-rebates-file-an-accounting-procedure/.

specified in their agreements with Third-Party Payers, but other types of rebates, as well as many other types of payments tied to a drug's benchmark price but not specifically denominated as a "rebate."  As a result, Defendants secretly collect—and retain—large amounts of monies simply by labeling drug company payments differently in their contracts with drug companies than they label those same payments in their contracts with their Third-Party Payer clients.

78.    For example, Express Scripts often agrees in its contracts with health plans to pass through "formulary rebates" and sometimes also some portion of "manufacturer administrative fees" related to invoicing and collecting rebates from drug companies.[40] However, according to the aforementioned Financial Disclosure attached to a rare, publicly available PBM service agreement, Express Scripts contracts with drug companies to receive other forms of "rebates"—such as "price protection rebates"—as well as many other forms of payments, including (i) "manufacturer administrative fees" related to purported other services the PBMs perform, such as purported formulary compliance initiatives, clinical services, educational services and therapy management services; (ii) payments related to the purported sale of non-patient identifiable claim information; (iii) payments for purported services performed for drug companies related to Express Scripts' subsidiary mail or specialty drug pharmacies; (iv) payments for purported "chain sourcing arrangements"; (v) payments for purported patient assistance programs or for patients enrolled in clinical trials, or for purported therapy adherence programs and various other clinical or pharmacy programs or services; and (vi) payments

---

[40] *Id.*

that purportedly promote safe, effective use and access to drugs.[41]   None of these additional payments falls under the label "formulary rebates" or "manufacturer administrative fees" related to invoicing and collecting rebates from drug companies.

79.     Drug companies do not care which labels PBMs, like Defendants here, assign to their payments.  Drug companies are concerned with the total amount they have to pay PBMs.  For example, a drug company does not care whether one of the Defendants in this case wants its payment to be labeled a "formulary rebate" of 5% of the total dollar volume of a drug that is dispensed to the PBM's commercial health plan members or a "market share rebate," "performance rebate," "manufacturer administrative fee," "purchase money discount," "health management fee," or "data sales fee" of the same amount.  Defendants, however, *do* care about the label assigned to a drug company payment, because Defendants know that they can retain payments that are labeled differently than the specified monies that they must remit to their Third-Party Payer clients.

80.     PBMs, including Defendants, often insert boilerplate provisions in their contracts with Third-Party Payer clients indicating that the PBM agrees to pass through 80%-100% of (some form of) "rebates."[42]   However, as discussed further below, Defendants make it nearly impossible for their Third-Party Payer clients to ascertain the

---

[41]    *See* Cahn, *It's Time To Determine How Much Your PBM Is Depriving Your Plan Of Rebates:  File An "Accounting" Procedure*, National Prescription Coverage Coalition (NPCC), *supra*, *http://nationalprescriptioncoveragecoalition.com/its-time-to-determine-how-much-your-pbm-is-depriving-your-plan-of-rebates-file-an-accounting-procedure/* (citing rare, publicly available municipal contracts with defendant PBMs that are on the internet, with Financial Disclosures in the contracts).

[42]    *Id.*

percentage of "rebates" that Defendants in fact retain.

81.    In recent years, industry experts have confirmed these practices.   For example, Linda Cahn of Pharmacy Benefit Consultants, a well-known PBM consultant to Third-Party Payers, noted in a press release that PBMs routinely play a "Rebate Re-Labeling Game" in their client contracts, wherein PBMs define drug company rebates in narrow terms in order to remit only a fraction of the amounts received from drug companies to Third-Party Payers.[43]   The Burchfield Group, a PBM auditing company based in Saint Paul, Minnesota, has echoed this concern in various press releases.[44]

82.    Likewise, the American Health Policy Institute has found that PBMs have responded to Third-Party Payer demands that PBMs pass back 100% of drug company rebates by relabeling monies received from drug companies:

> [T]he [PBM] industry has moved to 'reclassifying' the rebate dollars as 'purchase order discounts' or 'administrative fees'.  Since the plan sponsor is often only contractually entitled to those things specifically defined in the contract as a 'rebate,' the PBM will pocket the purchase order discounts. Thus, while a plan sponsor may believe that it has negotiated a fully 'transparent' PBM deal (receiving 100 percent of the revenue coming from the manufacturer), what the plan sponsor doesn't realize is that some portion of the rebates have been carved-off and paid to the PBM as a

---

[43]   Cahn, *Message from Mylan: It's Time For Every Health Plan To Address Rebate Issues*, National Prescription Coverage Coalition (NPCC), *supra*, http://nationalprescriptioncoveragecoalition.com/message-from-mylan-its-time-for-every-health-plan-to-address-rebate-issues/.

[44]   Chris Hanson-Ehlinger, *Receive full value from your PBM rebates*, The Burchfield Group (Nov. 20 2014), http://www.burchfieldgroup.com/pharmacy-benefit-blog/bid/203233/Receive-full-value-from-your-PBM-rebates; Brett McCabe, *Getting Your Fair Share: 5 Tips for Optimizing PBM Rebates*, The Burchfield Group (Apr. 26, 2017),   http://www.burchfieldgroup.com/pharmacy-benefit-blog/getting-your-fair-share-5-tips-for-optimizing-pbm-rebates.

purchase order discounts or admin fee etc.[45]

83.     Notably, even where a Third-Party Payer is aware of these practices, it is nonetheless unable to determine the total dollar or percentage amounts of drug company payments that the PBM retains.  Indeed, Defendants refuse to disclose such information to any Third-Party Payer client.[46]  As noted by Steve Pociak of the American Consumer Institute:

> [O]nly a PBM has a complete understanding of the prices and costs flowing between the various players involved in prescription plans. This unique insight comes from a PBM's involvement in administering prescription plans for sponsors (and their employees and beneficiaries), and from the PBM acting as middleman in a series of opaque transactions involving sponsors, beneficiaries, pharmacies and [drug companies].  These interactions among various parties create an environment for conflicts that drive PBMs to work for their self-interests, unbeknownst to the sponsor or beneficiary.[47]

84.     Indeed, Defendants generally issue reports to their Third-Party Payer clients

---

[45]   Eickelberg, *The Prescription Drug Supply Chain "Black Box" - How it Works and Why You Should Care*, *supra*, http://www.americanhealthpolicy.org/Content/documents/resources/December%202015_AHPI%20Study_Understanding_the_Pharma_Black_Box.pdf

[46]   Stephan Barlas, *Employers and Drugstores Press for PBM Transparency, A Labor Department Advisory Committee Has Recommended Changes*, NCBI (Mar. 2015), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4357353/; *Understanding Your PBM Contract*, Pharmacy Benefit Consultants, http://pharmacybenefitconsultants.com/understand-your-pbm-contract/ (last visited Sept. 25, 2017); David Contorno, *Lawsuit Sheds Light on PBM Fees*, Insurance Thought Leadership (Sept.1, 2017), http://insurancethoughtleadership.com/lawsuit-sheds-light-on-pbm-fees/pdf/, at 1-2.

[47]   Steve Pociask, *Pharmacy Benefit Managers: Market Power and Lack of Transparency*, The American Consumer Institute (2017), http://www.theamericanconsumer.org/wp-content/uploads/2017/03/ACI-PBM-CG-Final.pdf.

37

regarding the rebates they are remitting to them with a single figure representing the total rebate reimbursement amount for the relevant period (typically, a quarter).[48]   For example, a PBM might issue a report to a client stating that the PBM passed through $556,298 in total rebates for the quarter.  The PBM does not report to the Third-Party Payer the rebates or other payments being passed through on a drug-by-drug basis.[49] Consequently, Third-Party Payers are left unable to determine the "net cost" of any specific drug, including EpiPen.

85.     From time to time, Third-Party Payers seek an audit of drug company payments that were passed through to them in order to ascertain whether their PBM is passing through sufficient monies.  In the course of these audits, PBMs ensure that their clients remain in the dark, unable to learn the "net cost" of any specific drug, including EpiPen.  For example, PBMs, including Defendants, require all auditors to execute an Auditor Confidentiality Agreement before conducting an audit.   These Auditor Confidentiality Agreements uniformly preclude the auditor from sharing with its (and the PBM's) Third-Party Payer client any drug-by-drug rebate information or the terms of any drug company rebate contract (including Mylan's contract with any of the Defendants). The auditor is only allowed to share the aggregate "rebate" amount the auditor ultimately

---

[48]   *PBM Compensation and Fee Disclosure*, Report to the Thomas E. Perez, U.S. Secretary of Labor, Advisory Council on Employee Welfare and Pension Benefit Plans (Nov. 2014), https://www.dol.gov/sites/default/files/ebsa/about-ebsa/about-us/erisa-advisory-council/2014ACreport1.pdf (last visited Sept. 25, 2017); Patricia M. Danzon, Ph.D. & Celia Moh, *PBM Compensation and Fee Disclosure*, 2014 ERISA Advisory Council (2014), https://www.dol.gov/sites/default/files/ebsa/about-ebsa/about-us/erisa-advisory-council/ACDanzon061914.pdf.

[49]   *Id.*

concludes is owed to the Third-Party Payer client.[50]

86.     Moreover, PBMs, including Defendants, are so secretive about their collection and distribution of drug company payments that, during an audit, Defendants uniformly (i) require preapproval of the client's chosen auditor; (ii) restrict the number of drug company contracts that can be reviewed to a very limited number (typically ten); (iii) similarly restrict the number of claims and time period that can be reviewed; (iv) refuse to allow any drug company contract to be copied; (v) require a PBM representative to sit with every auditor that is reviewing a drug company contract; and (vi) refuse to allow any auditor to copy by hand the terms of any drug company contract, among other things.[51]

### 6.     *Rebate Calculation and Invoicing Is Tied to the Administration of Benefits for Class Members' EpiPen Prescriptions*

87.     Rebates are most often calculated and invoiced on a per-prescription or per-

---

[50]     Cahn, *Eliminate All PBM Contract Loopholes*, *supra*, http://www.ifebp.org/inforequest/0164413.pdf; *PBM Compensation and Fee Disclosure*, Hearing Before the Employee Benefit Security Administration Advisory Council on Employee Welfare and Pension Benefit Plans, U.S. Department of Labor (Aug. 20, 2014) (testimony of Susan A. Hayes, AHFI, Principal, Pharmacy Outcomes Specialists), available at https://www.dol.gov/sites/default/files/ebsa/about-ebsa/about-us/erisa-advisory-council/AChayes082014.pdf; *PBM Compensation and Fee Disclosure*, Report to the Thomas E. Perez, U.S. Secretary of Labor, *supra*, https://www.dol.gov/sites/default/files/ebsa/about-ebsa/about-us/erisa-advisory-council/2014ACreport1.pdf; Robert Shelley & Brian Anderson - Presenters, *PBM Contracts: How to Use Audits and Market Checks to Improve Your Bottom Line*, Atlantic Information Services, Inc. (Jan. 28, 2014) https://aishealth.com/sites/all/files/file_downloads/c4p04f_012814.pdf.

[51]     *Id.*

drug unit[52] basis.   PBMs, including Defendants, have created computer systems that automatically compile rebate data and calculate rebate amounts for invoicing.[53]   PBMs generally invoice drug companies for rebate payments on a monthly or quarterly basis. To receive rebates for a given drug, the PBM provides to the drug company data generated by the PBM's computer system indicating all instances where the drug was dispensed to health plan members and beneficiaries.

88.    As CVS Health states in its 2016 SEC Form 10-K, "[r]ebates are recognized when prescriptions are dispensed and are generally calculated and billed to manufacturers within 30 days of the end of each completed quarter."   Similarly, Express Scripts states in its 2015 SEC Form 10-K that "[r]ebates and administrative fees billed to manufacturers are determinable when the drug is dispensed."   Likewise, Prime calculates a net cost per prescription, including manufacturer rebates or administrative fees.[54]   In its 2015 SEC Form 10-K, Catamaran states that it "recognizes rebates when the Company is entitled to them, and when the amounts of the rebates are determinable."   It further states that "[r]evenue related to the sales of prescription drugs is recognized when the claims are adjudicated and the prescription drugs are shipped.   Claims are adjudicated at the

---

[52]   A drug unit is a single unit of a given drug.  For example, a single pill is a drug unit.  In the case of EpiPen, a drug unit is a single EpiPen.

[53]   Cahn, *It's Time To Determine How Much Your PBM Is Depriving Your Plan Of Rebates:  File An "Accounting" Procedure*, National Prescription Coverage Coalition (NPCC), *supra*, http://nationalprescriptioncoveragecoalition.com/its-time-to-determine-how-much-your-pbm-is-depriving-your-plan-of-rebates-file-an-accounting-procedure/.

[54]   *Looking Back Moving Forward, 2014 Report on Prescription Drugs*, Prime Therapeutics (June 2014), https://www.primetherapeutics.com/content/dam/corporate/Documents/Newsroom/Prime Insights/2014/2014-report-on-rx-costs.pdf.

point-of-sale using a real-time processing system."   In its 2016 SEC Form 10-K, UnitedHealth, Optum's parent company, states that Optum "accrues rebates as they are earned by its [Third-Party Payer] clients on a monthly basis" through dispensed prescriptions.  Optum then "bill[s] these rebates to the manufacturers on a monthly or quarterly basis…"

89.     Rebates are calculated based on dispensed prescriptions because the number of dispensed prescriptions for a given drug is indicative of that drug's market share (also referred to as "utilization").  As the American Health Policy Institute has found, "[d]rug manufacturers only pay rebates dollars to the party responsible for adjudicating the pharmacy claim.  The assumption is that the party that adjudicates the claim . . . is the party that has the ability to 'steer' utilization of the drug."[55]  Indeed, "rebates tend only to be available to PBMs because only PBMs can demonstrate to the manufacturer an adequate ability to steer patient utilization."[56]

90.     Drug companies have acknowledged this.  As a Mylan spokeswoman told CNBC in September 2016, "[a]s aligned with standard industry practice, we pay rebates to allow for patient access to EpiPen Auto-Injector. . . ."[57]  In addition, Mylan CEO

---

[55]   Eickelberg, *The Prescription Drug Supply Chain "Black Box" - How it Works and Why You Should Care*, *supra*, http://www.americanhealthpolicy.org/Content/documents/resources/December%202015_ AHPI%20Study_Understanding_the_Pharma_Black_Box.pdf, at 11.

[56]   *Id.*

[57]   Dan Mangan, *EpiPen Outrage: New pressure on Mylan as CEO Heather Bresch prepares to testify*, CNBC (Sept. 20, 2016), https://www.cnbc.com/2016/09/20/new-pressure-on-mylan-as-ceo-heather-bresch-prepares-to-testify.html.

Heather Bresch told investors on a Q4 2015 Earnings Call that, "in a very competitive multi-epinephrine marketplace . . . we were maintaining market share.  And to do so, that required aggressive rebating."[58]

91.    As Kaleo alleged in the ESI/Kaleo Lawsuit, discussed *supra*, "[b]y contracting with Express Scripts and agreeing to pay rebates and administrative fees, Kaleo expected that Express Scripts would help Kaleo increase patient access to [its auto-injector] Envizio."  And these rebates were to be paid to Express Scripts in exchange for "utilization" of Envizio.  ESI/Kaleo Lawsuit (Answer to Complaint, filed June 22, 2017), ¶¶ 42-43.

92.    In addition, another drug company, Novo Nordisk A/S has stated that it pays "rebates [to PBMs] to obtain broader coverage for our products."[59]

93.    In short, drug companies pay rebates to PBMs regarding a given drug in exchange for a certain number of filled prescriptions for that drug.  As noted in ¶¶ 37-38, dispensing a drug to a health plan member or beneficiary under the terms of their health plan necessitates a prescription drug benefit claim and the administration of benefits for that drug by the PBM.  This, in turn, triggers a reimbursement for the drug paid by the Third-Party Payer to the PBM.  *See id.*  Thus, each time Defendants administer benefits to the Class for EpiPen, they are entitled to receive a rebate and other monies from Mylan.  And, as discussed further below, those monies often is not passed back to the

---

[58] Mylan, Q4 2015 Earnings Conference Call, Mar. 3, 2015.

[59]    Novo  Nordisk,  2016  Annual  Report,  available  at http://www.novonordisk.be/content/dam/Denmark/HQ/AnnualReport/2016/PDF/Novo-Nordisk-Annual-Report-2016.pdf.

Third-Party Payer.

**E.    Recent Data Demonstrates That Rebates and Other Monies Paid to PBMs Account for the Bulk of List Price Increases for Brand Name Drugs Like EpiPen**

94.    A study conducted by the non-profit, non-partisan Center for Medicine in the Public Interest[60] estimates that, from 2011-2015, rebates paid to PBMs grew as a percentage of total manufacturer list price increases from 6.5% to an astounding 77.4%. In 2016, rebates paid to PBMs accounted for 79% of total manufacturer list price increases.[61]    These increases coincided with Defendants' successfully extracting enormous sums from drug companies through the use of formulary exclusions.  *See* ¶¶ 57-60.



---

[60]    Robert Goldberg, *Most of the Increase in Drug Spending Pocketed By PBMs and Insurers*, DrugWonks.com (Apr. 15, 2016), http://drugwonks.com/blog/most-of-the-increase-in-drug-spending-pocketed-by-pbms-and-insurers (last visited Sept. 25, 2017).

[61]    *See* Robert Goldberg, *Reduce Drug Prices by Cutting Out PBM Rebates*, DrugWonks.com (Feb. 8, 2017), http://drugwonks.com/blog/reduce-drug-prices-by-cutting-out-pbm-rebates (last visited Sept. 25, 2017).

95.    An April 2016 study conducted by the IMS Institute for Healthcare Informatics compared brand drug companies' "invoice price growth" (*i.e.* benchmark prices) with the estimated "net price growth" (factoring in rebates paid to PBMs) of brand drugs over a five-year period.   As reflected in the graph below, invoice prices climbed from 2013 to 2015 between 11.5% and 14.3% per year, while net prices growth fell from roughly 5% to 2.8% during the same period.[62]   Notably, in these three years, PBMs successfully extracted enormous rebates from drug companies through the use of formulary exclusions.  *See* ¶¶ 57-60.



---

[62]   Medicines Use and Spending in the U.S., A Review of 2015 and Outlook to 2020, IMS Institutes for Healthcare Informatics (April 2016), https://morningconsult.com/wp-content/uploads/2016/04/IMS-Institute-US-Drug-Spending-2015.pdf (last visited Sept. 25, 2017).

522446.1

96.     The federal government agency responsible for Medicare and Medicaid, known as the Centers for Medicare and Medicaid Services ("CMS"), reached a similar conclusion about the impact of drug companies' payments to PBMs on brand drug list prices.  Under Medicare law, PBMs and plans providing Medicare coverage must pass through to the government all "Direct and Indirect Remuneration" (known as "DIR") that they receive from drug companies and other third parties.  DIR is defined as all forms of rebates, administrative fees, discounts and other payments.  In a January 19, 2017 report,[63] CMS observed "a notable growth in" DIR compensation, as well as a "growing disparity between gross [Medicare] Part D drug costs, calculated based on costs of drugs at the point-of-sale, and net Part D drug costs, which account for all DIR." Like the aforementioned IMS studies, the CMS report states that "[g]ross drug costs and DIR have grown most dramatically since 2013," when PBMs began successfully extracting enormous rebates from drug companies through the use of formulary exclusions.  *See* ¶¶ 57-60.

---

[63]    *Medicare Part D – Direct and Indirect Remuneration (DIR)*, Centers for Medicare & Medicaid Services (Jan 19, 2017), https://www.cms.gov/newsroom/mediareleasedatabase/fact-sheets/2017-fact-sheet-items/2017-01-19-2.html (last visited Sept. 25, 2017).



| | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|
| **Total DIR (Billions)** | $8.7 | $9.7 | $10.5 | $13.4 | $17.4 | $23.6 |
| **Gross Drug Costs (Billions)** | $77.5 | $84.8 | $89.7 | $103.6 | $121.5 | $137.4 |

*Source: Analysis of DIR and enrollment data from the 2016 Annual Report of the Boards of Trustees of the Federal Hospital Insurance and Federal Supplemental Medical Insurance Trust Funds (CY 2016 Medicare Trustee's Report) and cost data from PDE records.*

**Figure 2 – Net Drug Costs**



*Source: Analysis of DIR data from the CY 2016 Medicare Trustee's Report and cost data from PDE records.*

46

**F.      Out-Of-Pocket Costs for Plan Members with Prescription Drug Benefits**

97.      In addition to the monthly or annual premiums described in ¶ 33, health plan members with prescription drug benefits often have to pay a certain amount out-of-pocket when filling a prescription at a pharmacy.  Out-of-pocket costs come in three forms:  deductibles, coinsurance and/or copayment requirements.

98.      *Deductibles*.  The term "deductible" refers to a fixed dollar amount that a health plan member must pay out-of-pocket annually for medical and/or prescription drug costs before the member's plan will issue healthcare reimbursements, including for prescription drug purchases.  For example, a given health plan might require its members to pay $3,000 out-of-pocket in a given year before benefits are administered.  While the health plan dictates the dollar amount of a deductible, the price the plan member pays for a given brand name drug while under a deductible is determined by the negotiated rate between the PBM and the pharmacy.  As previously discussed, this price is based on the drug's AWP or WAC.  And, as discussed further below, PBMs successfully incentivize drug companies like Mylan to increase the list price for their drugs, including EpiPen, at the expense of Class members who pay for EpiPen out-of-pocket before they have satisfied their plan's deductible.

99.      Most ERISA health plans have a deductible.  According to a Kaiser Family Foundation September 2016 survey,[64] "[e]ighty-three percent of covered workers have a general annual deductible for single coverage that must be met before most services are

_____

[64] *See 2016 Employer Health Benefits Survey*, The Henry J. Kaiser Family Foundation (Sept. 14, 2016), http://www.kff.org/report-section/ehbs-2016-summary-of-findings/ (last visited Sept. 25, 2017).

paid for by the plan."  Moreover, as reflected in the Chart below, in recent years, deductibles have continuously increased for ERISA health plans, and by 2016, more than half of all covered workers had deductibles of more than $1,000.



**Percentage of Covered Workers Enrolled in a Plan with a General Annual Deductible of $1,000 or More for Single Coverage, By Firm Size, 2006-2016**

* Estimate is statistically different from estimate for the previous year shown (p < .05).

NOTE: These estimates include workers enrolled in HDHP/SO and other plan types. Average general annual health plan deductibles for PPOs, POS plans, and HDHP/SOs are for in-network services.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2006-2016.



100.    In addition, many ERISA health plans are high-deductible health plans (HDHPs) with multi-thousand dollar annual deductibles.[65]  According to a January 5, 2016 report from the Kaiser Family Foundation and the Journal of the American Medical Association ("JAMA"), deductibles rose 67% between 2010 and 2015.  The report found that the average annual deductible for an individual enrolled in an HPHP was between

---

[65]    As of 2017, HDHPs are those with minimum annual deductibles of $1,300 for individuals and $2,600 for families.  *See* High Deductible Health Plan (HDHP), HealthCare.gov,  https://www.healthcare.gov/glossary/high-deductible-health-plan/  (last visited Sept. 25, 2017).

522446.1

$2,031 and $2,295 for individuals and $4,321 and $4,364 for families.

101.   Moreover, the percentage of covered workers enrolled in high-deductible health plans has increased from 13% in 2010 to 29% in 2016.

**Percentage of Covered Workers Enrolled in High-Deductible Health Plans from 2006-2016**



*Estimate is statistically different from estimate for the previous year shown (p<.05).

NOTE: Covered Workers enrolled in an HDHP/SO are enrolled in either an HDHP/HRA or a HSA-Qualified HDHP. For more information see the Survey Methodology Section. The percentages of covered workers enrolled in an HDHP/SO may not equal the sum of HDHP/HRA and HSA-Qualified HDHP enrollment estimates due to rounding.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2006-2016.

102.   Rising drug benchmark prices (AWP and WAC) for drugs like EpiPen are particularly harmful to those in high-deductible health plans, who often have trouble affording prescription drugs, and are even forced to forego purchasing needed prescription drugs, like a potentially lifesaving EpiPen, due to high annual out-of-pocket costs.

49

103.   *Coinsurance and Copayments*.   Most ERISA health insurance plans require plan members to make copayments[66] or coinsurance payments[67] for medical care and prescription drugs.   A copayment is a fixed dollar amount, set by the health insurance plan, that plan members must pay at the time they receive medical care or prescription drugs. In the case of prescription drugs, plan members pay copayments to the pharmacy. Copayment amounts vary depending on the formulary tiering of the drug.   Drugs placed by the PBMs in preferred formulary tiers require lower copayments, while drugs placed in less favored tiers require higher copayments.

104.   For example, a PBM formulary with three copayment tiers could have copayments of $25/$50/$75, in which case an insured would pay $25 to fill a prescription for a first-tier drug, $50 for a second-tier drug, and $75 for a third-tier drug.   Individuals who purchased EpiPen under a copayment scheme with fixed dollar amounts, such as the one described above, are not included in the Class unless they also incurred out-of-pocket costs under deductible or coinsurance requirements.

105.   Coinsurance is similar to copayments.   However, instead of paying a fixed dollar amount for a particular service, plan members pay a fixed *percentage* of the cost of the healthcare service provided.   For a prescription drug, this means paying a percentage of the negotiated rate between the PBM and the pharmacy for the drug, which, as previously discussed, is based on the drug's AWP or WAC.   As with the dollar amount of a deductible, the health plan dictates the specific percentage for coinsurance.   However,

---

[66]   Copayments are also known as "copays."

[67]   Coinsurance payments are also known as "percentage-based copayments" or "percentage-based copays."

as discussed further below, PBMs successfully incentivize drug companies like Mylan to increase these benchmark prices (AWP and WAC) for their drugs, including EpiPen, which, in turn, increases the total dollar amount of coinsurance that Class members are required to pay for EpiPen.

106.    For those plan members whose ERISA health plans have three or more tiers of cost sharing for prescription drugs, the Kaiser Family Foundation reports that average coinsurance rates are as follows:

- 17% for first-tier drugs (typically generics).

- 25% for second-tier drugs (typically "preferred" brand drugs).

- 37% for third-tier drugs (typically "non-preferred" brand drugs).

- 29% for fourth-tier drugs (typically extremely high-cost drugs, known as "specialty drugs").[68]

107.    EpiPen is generally classified on formularies as a second or third-tier drug. As a result, coinsurance payments for EpiPen can be a heavy financial burden on Class members.    And that burden has increased dramatically over time as a result of Defendants' conduct that has induced Mylan to increase EpiPen's list price.

108.    For example, with an EpiPen pharmacy reimbursement rate of $600, a plan member without a deductible, or whose deductible has been satisfied, would pay, under average coinsurance rates, $150 if EpiPen were classified as a second-tier drug, or $222 if EpiPen were classified as a third-tier drug.

---

[68]    These figures come from a 2016 Kaiser Family Foundation study of employer health benefits.  *2016 Employer Health Benefits Survey*, The Henry J. Kaiser Family Foundation,  *supra*,  http://kff.org/report-section/ehbs-2016-section-nine-prescription-drug-benefits/.

109.   For those plan members whose ERISA health insurance plans have annual deductibles, copayments and coinsurance obligations begin after plan members exhaust their deductibles.   Plans without a deductible require copayments or coinsurance contributions for every prescription drug purchase.

110.   A March 27, 2017 Research Letter published by the Journal of the American Medical Association (JAMA)[69] (the 2017 "JAMA Research Letter") shows that, since Mylan acquired the rights to market and distribute EpiPen in 2007, consumers have faced massive growth in out-of-pocket costs—including copayments, coinsurance payments, and deductible payments.   The chart below was included in the 2017 JAMA Research Letter:



Figure. Trends in Annual EpiPen Out-of-Pocket Spending per Patient

111.   The 2017 JAMA Research Letter concluded:   "Among commercially

---

[69]   Kao-Ping Chua, MD, PhD; Rena M. Conti, PhD, *Out-of-Pocket Spending Among Commercially Insured Patients for Epinephrine Autoinjectors Between 2007 and 2014*, JAMA Internal Medicine (Mar. 27, 2017).

insured patients who use EpiPen, annual EpiPen out-of-pocket spending more than doubled between 2007 and 2014. Simultaneously, the annual rate of EpiPen prescription fills barely increased, suggesting that the increased financial burden on patients was not driven by higher use."

112.    In addition, according to the 2017 JAMA Research Letter, the percentage of commercially insured EpiPen patients with at least $100 in annual out-of-pocket spending for EpiPen has increased between 2007 and 2014, from 3.9% to 18.0%, an increase of 365.6%. The percentage of EpiPen patients with at least $250 in annual out-of-pocket spending has increased during those years from 0.1% to 7.4%, an increase of 5,631.7%. Among the sampled population of people who receive private health insurance through more than 100 employers nationwide (which grew 70.9% between 2007 and 2014, to more than 25 million people), coinsurance payments for EpiPen increased 1,531.6% and deductible payments increased 1,612.0%, disproportionately higher than the increase in total EpiPen spending of 974.7%.

113.    PBMs openly admit that EpiPen purchasers face increasing out-of-pocket costs under the health plans whose benefits they administer. In an October 2016 press release, defendant CVS Caremark stated: "[c]opays have risen for many consumers over the last several years," and "[m]embers of consumer-driven or high deductible plans can also face a large payment, which can pose a real deterrent when filling the prescription."[70] In an October 7, 2016 article in the *Wall Street Journal* about how high

---

[70] *See EpiPen: What You Need to Know*, CVS Health Insights Commentary (Oct. 11, 2016), http://insights.cvshealth.com/sites/default/files/cvs-health-insights-executive-briefing-epipen-what-you-need-to-know-october-2016.pdf.

list prices impose significant out-of-pocket costs for EpiPen and certain other drugs, Express Scripts' Chief Medical Officer admitted that "certain patients get caught in the middle of this, and we have got to figure out how to put guard rails around that."[71]

114.    Similarly, in a September 2, 2016 article in *Pharmacy Practice News* regarding EpiPen's dramatically high list price, Prime's Chief Clinical Officer noted the increasing number of "high-deductible plans where the member would pay out of pocket the full cost up to a deductible amount."[72]

**G.    Increases In EpiPen's List Price Are Caused By Defendants' Collection of Increasing "Rebates" And Other Monies**

   **1.    *Mylan and Other Drug Companies State That PBMs' Collection of Rebates and Other Monies Cause Them to Increase List Prices***

115.    On September 21, 2016, Mylan CEO Heather Bresch testified before Congress about the high list price of EpiPen.  According to Bresch, $334 of the $608 list price for an EpiPen 2-Pak can be attributed to payments to PBMs and other channel vendors.[73]  In doing so, CEO Bresch held up the following chart:

---

[71]    Denise Roland & Peter Loftus, *Insulin Prices Soar While Drugmakers' Shares Stay Flat*, The Wall Street Journal (Oct. 7, 2016), https://www.wsj.com/articles/insulin-prices-soar-while-drugmakers-share-stays-flat-1475876764.

[72]    Gina Shaw, *Prescribers, Payors Respond to EpiPen Price Hikes*, Pharmacy Practice News (Sept. 2, 2016), http://www.pharmacypracticenews.com/Policy/Article/09-16/Prescribers-Payors-Respond-to-Epi-Pen-Price-Hikes/37832/ses=ogst?enl=true.

[73]    *Reviewing the Rising Price of EpiPens*, Hearing before the United States House of Representatives Committee on Oversight and Government Reform (Sept. 21,2016) (testimony of Heather Bresch, Chief Executive Officer, Mylan Inc.), available at https://oversight.house.gov/wp-content/uploads/2016/09/2016-09-21-Mylan-CEO-Bresch-Testimony.pdf.





116.   Moreover, a few weeks before Bresch's Congressional testimony, Brian Sullivan of CNBC asked Bresch why Mylan won't simply lower EpiPen's list price. Knowing that formulary access and placement required Mylan to make significant payments to PBMs, thereby requiring a high list price for EpiPen, Bresch responded: "Brian, here's the perverse thing.  Had we reduced the list price, I couldn't ensure that everyone who needs an EpiPen gets one."[74]

117.   Novo Nordisk has also acknowledged that it raised the list price of its analog insulin, NovoLog, to offset the collection of larger and larger rebates.  As Novo

---

[74] *CNBC Transcript: Mylan CEO Heather Bresch Sits Down with CNBC's Brian Sullivan Today on "Squawk Box"*, First on CNBC (Aug. 25, 2016), https://www.cnbc.com/2016/08/25/first-on-cnbc-cnbc-transcript-mylan-ceo-heather-bresch-sits-down-with-cnbcs-brian-sullivan-today-on-squawk-box.html (last visited Sept. 25, 2017).

Nordisk stated in a 2016 press release, "as the rebates, discounts and price concessions got steeper, we were losing considerable revenue . . . .  So, we would continue to increase the list [price] in an attempt to offset the increased rebates, discounts and price concessions to maintain a profitable and sustainable business."[75]

118.   Gilead Sciences, Inc. has stated that it maintains an extremely high list price for its blockbuster hepatitis C cure, Sovaldi, because PBMs would otherwise refuse to list it on their formularies for failure to generate sufficient rebates.  As Jim Meyers, executive vice president of worldwide commercial operations, told *Bloomberg*, "[i]f we just lowered the cost of Sovaldi from $85,000 to $50,000, every payer would rip up our contract."[76]  Meyers further stated that he "ha[s] never met, in this entire experience, a PBM or a payer outside of the Medicaid segment that preferred a price of $50,000 over $75,000 and a rebate back to them."  He also noted that "[w]e have a system that's incentivized upon rebate revenue."

### 2.     *Industry Experts Similarly State That PBMs' Collection of Rebates and Other Monies Cause Drug Companies to Increase List Prices*

119.   Pharmaceutical industry experts have frequently pointed out that PBMs' extraction of rebates and other monies from drug companies directly contribute to increased drug company list prices.  A May 2017 white paper issued by the Pacific

---

[75]   *Our perspectives on pricing and affordability*, Novo Nordisk US (Nov. 2016), http://www.novonordisk-us.com/blog/perspectives/2016/november/our_perspectives.html (last visited Sept. 25, 2017).

[76]   Caroline Chen & Robert Langreth, *Gilead Executive Says Pharmacy Benefit Managers Keep Prices High* (Mar. 3, 2017), https://www.bloomberg.com/news/articles/2017-03-03/gilead-executive-says-pharmacy-benefit-managers-keep-prices-high.

Research Institute states that PBMs "[c]reate pricing uncertainty by incentivizing higher list prices for medicines that enable large rebates and discounts (which are particularly valuable for PBMs)."[77]

120.    Similarly, Robert Galvin, MD, the CEO of an HMO, and Roger Longman, the CEO of a healthcare analytics company, published a December 1, 2015 article in the Harvard Business Review stating that "pharmaceutical companies don't deserve all of the blame for high drug prices," because "lots of other actors in purchasing, distribution, and brokerage [like PBMs] have greater incentives to keep prices high than to lower prices or choose drugs that reduce longer-term medical and business costs."[78]    The Harvard Business Review article goes on to note that PBMs incentivize and prefer higher list prices because it results in increased rebates.[79]

121.    Likewise, Howard Deutsch, a consultant at ZS Associates who advises drug companies on working with PBMs and other entities told *The Wall Street Journal* that PBMs' "incentives align more to a higher gross price and a higher discount than to truly

---

[77]    Wayne Winegarden, Ph.D., *The Economic Costs of Pharmacy Benefit Managers: A Review of the Literature*, Pacific Research Institute Issue Brief (May 2017), http://www.pacificresearch.org/wp-content/uploads/2017/06/PBM_Lit_Final.pdf, at 3.

[78]    Robert Galvin, M.D. & Roger Longman, *Who Has the Power to Cut Drug Prices? Employers*, Harvard Business Review (Dec. 1, 2015), https://hbr.org/2015/12/who-has-the-power-to-cut-drug-prices-employers.    This article also appeared in the New England Journal of Medicine on January 13, 2016.  *See* Galvin & Longman, *Who Has the Power to Cut Drug Prices? Employers*, New England Journal of Medicine Catalyst (Jan. 13, 2016), http://catalyst.nejm.org/who-has-the-power-to-cut-drug-prices/.

[79]    *Id.*

reducing the cost to everyone involved, . . ."[80]

122.   In an August 29, 2016 CNBC article about EpiPen pricing outrage, Scott

Gottlieb, MD, the current Commissioner of the FDA, explained that as PBMs

"consolidated and began to exert more leverage, and as the drug market became more

competitive . . . the pharmaceutical companies had to start paying bigger rebates.  To

make headway for bigger rebates, they've been hiking the list prices on their

medicines."[81]  Likewise, in a September 12, 2016 article discussing Mylan CEO Heather

Bresch's congressional testimony about EpiPen's high list price, Commissioner Gottlieb

wrote:

> The public reproach over the price of Mylan's lifesaving drug EpiPen is the
> latest imbroglio in a much broader debate over drug costs. At issue is the
> rising list price on drugs.
>
> ***
>
> Mylan pointed to a long sequence of drug supply middlemen who get a
> series of rebates, mostly as economic inducements for helping drug makers
> sell their medicines.  To fund these rebates, drug makers push up the list
> price of their pills, only to furtively pay much of the money back to
> pharmacy benefit managers later.
>
> This byzantine model for selling drugs aids both parties – the drug makers
> who use the rebates to buy access on restrictive drug formularies, and the
> pharmacy benefit managers that take a cut from these rebates to improve
> their profit margins.[82]

---

[80]   Jonathan D. Rockoff, *Behind the Push to Keep Higher-Priced EpiPen in Consumers' Hands*, The Wall Street Journal (Aug. 6, 2017), https://www.wsj.com/articles/behind-the-push-to-keep-higher-priced-epipen-in-consumers-hands-1502036741.

[81]   Scott Gottlieb, *Why drug makers charge outrageous prices*, CNBC (Aug. 29, 2016), https://www.cnbc.com/2016/08/29/why-drug-makers-charge-outrageous-prices-commentary.html.

[82]   Scott Gottlieb, *How Congress Can Make Drug Pricing More Rational*, Forbes (Sept. 12, 2016), https://www.forbes.com/sites/scottgottlieb/2016/09/12/how-congress-can-make-drug-pricing-more-rational/#6e19d6933e3b.

123.    Furthermore, a recent report on the drug industry noted that, in addition to rebates related to formulary access and market share, price/inflation protection rebates also incentivize list price increases:

> At the whole-market level, we sense that the price protection rebate arbitrage game is driving manufacturers to higher list price increases than would otherwise occur, . . .   Price protection rebates between brand manufacturers and PBMs are common, as are fixed rebate agreements between PBMs and a significant portion of their plan sponsors. When brand manufacturers' [list price] increases exceed the price protection threshold, the manufacturers rebate the difference to PBMs, who pocket the difference when these price protection rebates grow faster than the PBMs' fixed rebate commitments to plan sponsors. Thus all else equal in a given category, the product with the more rapid list price increases is more profitable to the PBM. Manufacturers, realizing this, don't want their products disadvantaged, and accordingly are driven to keep their rates of list price inflation at least as high, and ideally just a bit higher, than peers'. Durable list price inflation is the natural result. Net price inflation is unaffected, but unit volumes suffer as higher list prices directly impact consumers who have not yet met their deductibles.[83]

**3.    *Competition between EpiPen and Its Competitors for Formulary Placement Further Demonstrates that PBM Rebates Induce List Price Increases for EpiPen***

124.    As previously discussed, formulary exclusions yield significant rebates, *see* ¶¶ 57-60, and, as formulary exclusions increased significantly beginning in 2013, so did the percentage of list price increases for brand name drugs that encompassed rebates, *see* ¶¶ 94-96.

125.    Likewise, a November 4, 2016 study by Argus Health estimated how much Mylan paid in EpiPen rebates to PBMs and health insurers between 2014 and 2016. According to this study, Mylan's payment of rebates and other monies to PBMs are by

---

[83]   Richard Evans, Scott Hinds, & Ryan Baum, *US Rx Net Pricing Trends Thru 2Q16*, SSR LLC (Oct. 5, 2016), at p. 31.

far the largest component of EpiPen's list price increases.[84]  As shown in the chart below, EpiPen's list price increased from $378 in 2014 to more than $600 in 2016, an increase of more than 158%, while EpiPen's net price after subtracting rebates increased less than 6%, from $294 to $311.



WAC = WHOLESALE ACQUISITION COST. ILLUSTRATIVE REBATE ANALYSIS FOR A GIVEN THREE-YEAR PERIOD

126.   The marked increase in the estimated rebates for EpiPen coincides with EpiPen's formulary competition with two other therapeutically interchangeable epinephrine auto-injectors: Adrenaclick and Auvi-Q.  Auvi-Q was released as a brand name auto-injector by Sanofi-Aventis, U.S. LLC, in 2013.  Adrenaclick was also released in 2013 by Amedra Pharmaceuticals as a generic.

127.   In 2014, Express Scripts excluded Auvi-Q from its standard formulary, while EpiPen remained.  Express Scripts defended the exclusion by stating: "In 2014 and

_____

[84] *See* AJ Ally, *The EpiPen Price Increase:  A Deeper Look at a Complicated Story*, Argus Health (Nov. 4, 2016), (formerly at: https://argus-health.com/2016/11/the-epipen-price-increase-a-deeper-look-at-a-complicated-story/).

2015, we leveraged the competition between EpiPen and Auvi-Q to earn additional discounts for our clients."  Express Scripts excluded Auvi-Q again in 2017 and made EpiPen the preferred auto-injector.  Adrenaclick has never appeared on Express Scripts' standard formulary.

128.   Between 2015 and 2017, CVS Caremark excluded Adrenaclick from its standard formulary.  During that time, CVS Caremark listed EpiPen and Auvi-Q as the formulary options for an epinephrine auto-injector and informed plan participants that if they use Adrenaclick, they "may be required to pay the full cost" and that they should ask their doctor to choose one of the "brand formulary options listed below," meaning EpiPen or Auvi-Q.  In addition, from at least 2015 through the start of 2017, EpiPen was the brand on Optum's standard formulary prescription drug lists, with Auvi-Q and Adrenaclick excluded, and certain UnitedHealth plans also covered only EpiPen on their prescription drug lists, while others included EpiPen in Tier 2 and Auvi-Q in Tier 3.  In 2015, Catamaran excluded Adrenaclick from its Value Formulary, and EpiPen was listed as preferred on its national formulary preferred drug list in 2014, 2015, and 2016. Prime's main formularies, including Generics Plus and PrimeChoice, also listed EpiPen at the exclusion of Auvi-Q and Adrenaclick.

**H.    Mylan's Payments of Rebates and Other Monies to Defendants Increases Out-of-Pocket Expenses for Plan Members Who Fill EpiPen Prescriptions under Deductibles and Coinsurance Provisions**

129.   Given that (a) rebates and other payments to Defendants by Mylan related to EpiPen have increased benchmark prices of EpiPen (*see* ¶¶ 115-128), and (b) deductible and coinsurance payments by Class members are based on EpiPen's

benchmark prices (*see* ¶¶ 98, 105), rebates and other payments to PBMs for EpiPen have increased out-of-pocket expenses for Class members.

130.   The January 19, 2017 CMS report (*see* ¶ 96) shows a strong correlation between DIR (largely PBM rebates) and point-of-sale drug costs (deductible and coinsurance payments based on benchmark prices).  The CMS report concludes that DIR "does not reduce the cost of drugs for beneficiaries at the point-of-sale," and that "[h]igher point-of-sale prices generally result in higher beneficiary cost-sharing obligations as cost-sharing is often assessed as a percentage of the list price."  A May 30, 2017 article from the Journal of the American Medical Association echoes this conclusion.[85]

131.   Defendants' conduct has caused Class members to pay increasing deductible and coinsurance amounts when filling prescriptions for EpiPen.  While Defendants do not set the dollar amount of an annual deductible or the percentage of coinsurance, they induce (and profit from) EpiPen's inflated benchmark price that serves as the basis for a deductible or coinsurance payment.  *See* ¶¶ 98, 105.  And as deductible and coinsurance requirements continue to expand, Class members are subject to EpiPen's benchmark prices on an ever-increasing basis.

132.   Indeed, Mylan CEO Heather Bresch lamented that patients are now paying benchmark-related prices for EpiPen during a CNBC interview:

---

[85]   Stacie B. Dusetzina, PhD, *et al.*, *Association of Prescription Drug Price Rebates in Medicare Part D With Patient Out-of-Pocket and Federal Spending*, JAMA Internal Medicine (May 30, 2017).

The patient is paying twice. . . . They're paying full retail price at the counter, and they're paying higher premiums on their insurance. It was never intended that a consumer, that the patients, would be paying list price, never. The system wasn't built for that.[86]

133.    Similarly, Robert Goldberg of the Center for Medicine in the Public Interest has noted that "as the share of drug spending as a percent of rebates has soared and the contribution of net price increases to spending has declined, PBMs and insurers have increased cost sharing by more than 25% since 2010."[87]  In other words, "rebates and discounts that could reduce the out of pocket cost of consumers is taken by [] PBMs [and] insurers . . . .  And to add insult to injury, these organizations turn around and charge consumers retail price and require them to pay an increasingly greater share of that cost."[88]

134.    The increasing number of patients with high-deductible healthcare plans and coinsurance obligations, together with the rise in deductible amounts and coinsurance percentages, has made the pain associated with the EpiPen price hikes particularly acute. Although epinephrine has been available for over a century and costs very little to produce, PBM greed has put EpiPen out of reach for many consumers.

135.    Unable to afford EpiPen, many patients are now facing grave risks.  They

---

[86]  Dan Mangan, *Mylan CEO Heather Bresch: 'No One's More Frustrated Than Me' About EpiPen Price Furor*, CNBC (Aug. 25, 2016), https://www.cnbc.com/2016/08/25/mylan-expands-epipen-cost-cutting-programs.html.

[87]  Robert Goldberg, Ph.D., *Drug Costs Driven By Rebates: Over $100 Billion In Price Cuts Go Directly To Insurers, Not Patients*, Centers for Medicine in the Public Interest (CMPI) (2015) http://bionj.org/wp-content/uploads/2015/11/drug-costs-driven-by-rebates.pdf, at 4.

[88]  *Id.* at 6.

have started carrying an expired EpiPen, or manually-filled syringes of epinephrine, even when they lack the medical training necessary to properly administer an injection.

136.   Congress has started to acknowledge the role of PBMs and Third-Party Payers in driving up prescription drug prices for their plan members.  On March 15, 2017, Senator Ron Wyden of Oregon introduced the Creating Transparency to Have Drug Rebates Unlocked (C-THRU) Act of 2017, which would require PBMs to disclose the rebates they receive from drug companies.

137.   U.S. Representative Earl L. "Buddy" Carter of Georgia recently discussed the role of PBMs in driving up the price of EpiPen on the floor of the House of Representatives.   Rep. Carter, a pharmacist and the owner of a pharmacy, recently recalled the testimony of Heather Bresch, Mylan's CEO:

> It was really interesting because, during the time that we were asking questions of the CEO, she mentioned, well, when it leaves us, it is this price right here—I am just going to use round figures—it is $150. By the time it gets to the pharmacist and by the time it is dispensed to the patient, it is $600.
>
> I asked her: What is that difference there? Where is that coming from?
>
> I don't know.
>
> I don't know either.
>
> Now, there is the beginning and the end. The beginning is the pharmaceutical [company]. She doesn't know. The end is me, the dispensing pharmacist, and I don't know.
>
> That is what I'm referring to when I talk about the man behind the curtain. That is where the PBMs come in.
>
> Now, they will tell you: Well, we are taking that money, and we are giving it back to the companies, to the insurance.

> Well, if they are, and they're not keeping any of it, then why are their profits going up so much? Why have their profits gone up over 600 percent? It's because they're keeping it. They're keeping it, and they're adding no value whatsoever to the system.

163 Cong. Rec. H1453 (daily ed. Mar. 1, 2017) (statement of Rep. Carter).

## I.     Plaintiff's EpiPen Purchase

138.     Defendants' invoicing and collection of rebates and other monies from Mylan regarding EpiPen caused Plaintiff and the Class to purchase EpiPen at inflated prices under the terms of their ERISA health plans.  For example, on January 15, 2015, Susan Illis filled a prescription for an EpiPen 2-Pak for her daughter at Walgreens. Because she had yet to satisfy the annual deductible under her ERISA-governed health insurance plan, she was subject to the full benchmark-related price of $421.57, pursuant to the terms of her plan.  Using a pharmacy coupon, she reduced her out-of-pocket cost to $321.57.

## V.     CLASS ALLEGATIONS

139.   Plaintiff brings this action on behalf of herself and all others similarly situated under Federal Rule of Civil Procedure 23(a), as well as 23(b)(1), 23(b)(2), and 23(b)(3), as a representative of the following Class:

> All persons residing in the United States and its territories who are or were participants in, or beneficiaries of, health insurance plans governed by ERISA, for which Defendants administered pharmacy benefits, and who paid any portion of the purchase price for EpiPen, EpiPen Jr., EpiPen 2-Pak, or EpiPen Jr. 2-Pak calculated by reference to a benchmark price, including but not limited to WAC (Wholesale Acquisition Cost) or AWP (Average Wholesale Price), as required by the terms of their health insurance and/or prescription drug benefit plans.  The class begins on June 2, 2011 and continues through the present.  Excluded from the class are governmental

65

entities;   Defendants;   any   parent,   subsidiary,   or   affiliate   of Defendants; Defendants' officers, directors, and employees; and the immediate family members of Defendants' officers, directors, and employees.

Plaintiff reserves the right to redefine the Class prior to certification.

140.   This action is brought, and may properly be maintained, as a class action pursuant to Federal Rule of Civil Procedure 23.   This action satisfies the numerosity, typicality,   adequacy,   predominance,   and   superiority   requirements   of   those provisions.  The members of the Class are readily ascertainable from records maintained by the Defendants and/or Third-Party Payers.

141.   <u>Numerosity</u>.   Members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable.   While the exact number of Class members is unknown to Plaintiff at this time, Plaintiff believes that likely millions of individuals   will   be   members   of   the   Class   and   that   those   individuals   are   readily identifiable in Defendants' records.   According to the Pharmaceutical Care Management Association, as of 2016, PBMs administer prescription drug benefits for 266 million Americans.   The four largest PBMs—Express Scripts, CVS Caremark, Optum, and Prime—administer prescription drug benefits for more than 200 million Americans, with Optum administering prescription drug benefits for approximately 65 million plan members.   Moreover, according to IMS Health, more than 3.6 million EpiPen prescriptions were written in 2015.  According to Mylan, nearly 70% of the prescriptions were for commercially insured patients.

142.   <u>Typicality</u>.   Plaintiff's claims are typical of the claims of the members of

the Class. Plaintiff and Class members all paid a portion of the purchase price for EpiPen calculated by reference to a benchmark price. Plaintiff and all members of the Class were damaged by the same wrongful conduct of Defendants—*i.e.*, as a result of Defendants' misconduct, breaches of their fiduciary duties, and/or violations of ERISA, Class members paid artificially inflated prices for EpiPen.

143. <u>Adequacy</u>. Plaintiff will fairly and adequately protect and represent the interests of the Class. The interests of Plaintiff are coincident with, and not antagonistic to, those of the other members of the Class. Plaintiff has retained counsel that are competent and experienced in the prosecution of complex class action litigation, including ERISA litigation, and have particular experience with class action litigation involving health insurers. Plaintiff's counsel will undertake to vigorously protect the interests of the Class.

144. <u>Commonality</u>. Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class members. The claims of all Class members originate from the same misconduct, breaches of fiduciary duties, and violations of ERISA perpetrated by Defendants.

145. Questions of law and fact common to Plaintiff and the Class include:

    a. Whether Defendants' conduct violated ERISA;

    b. Whether Defendants acted as fiduciaries under ERISA;

    c. Whether Defendants acted as ERISA fiduciaries, co-fiduciaries, or non-fiduciaries in collecting rebates and other monies from Mylan related to EpiPen;

d.  Whether Defendants act as ERISA fiduciaries in administering prescription drug benefits for EpiPen to Class members based on a benchmark-related price;

e.  Whether Defendants breached their fiduciary duties to Class members by collecting rebates and other monies from Mylan related to EpiPen that induced Mylan to increase EpiPen's list price;

f.  Whether Defendants breached their fiduciary duties to Class members by administering health plan benefits for EpiPen to Class members based on a benchmark-related price;

g.  Whether Defendants engaged in prohibited transactions;

h.  Whether Defendants had and/or exercised their discretion to label monies received from Mylan as they so chose;

i.  Whether Defendants had and/or exercised their discretion to choose their rate of reimbursement to retail pharmacies for EpiPen;

j.  Whether Class members are entitled to restitution, disgorgement, surcharge, an injunction, and/or other appropriate equitable relief; and

k.  Whether Defendants knowingly participated in, enabled and/or knew or had constructive knowledge of other fiduciaries' violations of ERISA, including breaches of fiduciary duty and engaging in prohibited transactions.

146.  Under Rule 23(b)(3), class action treatment is a superior method for the fair and efficient adjudication of the controversy.  Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons a method for obtaining

redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.

147.   This action is also maintainable as a class action under Rule 23(b)(2) because Defendants have acted, or refused to act, on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

148.   With respect to Rule 23(b)(1)(B), the prosecution of separate actions by each plaintiff in the Class would create a risk of adjudications with respect to individual members of the Class that would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

149.   Finally, Class action status is also warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.

150.   Plaintiff knows of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## VI.    CLAIMS FOR RELIEF

151.   Section 502(a)(3) of ERISA authorizes individual participants and beneficiaries to bring suit "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan."  29 U.S.C. § 1132(a)(3).  The remedies set forth in § 502(a)(3)

include remedies for breaches of the fiduciary duties set forth in ERISA § 404, 29 U.S.C. §1104, and for violation of the prohibited transaction rules set forth in ERISA § 406, 29 U.S.C. § 1106.

152.   ERISA defines a fiduciary as any person who "exercises any discretionary authority or discretionary control respecting management of [a] plan or exercises any authority or control respecting management or disposition of its assets;" or any person who "has any discretionary authority or discretionary responsibility in the administration of such plan. 29 U.S.C. § 1002(21)(A)(i), (iii).

153.   Defendants are fiduciaries of Class members' ERISA health plans for which they administer prescription drug benefits in that Defendants exercise discretionary authority or control respecting the management or disposition of the Class members' ERISA health plans' assets and in that Defendants have discretionary authority or discretionary responsibility in the administration of the Class members' ERISA health plans.

154.   Defendants acted as fiduciaries in limiting the prescription drugs covered by Class members' ERISA health plans through the inclusion of prescription drugs on, and the exclusion of prescription drugs from, the formularies for Class members' health plans.

155.   Defendants acted as fiduciaries in setting their own compensation for the administration of Class members' prescription drug benefits.  Defendants have the authority and discretion to label and designate monies received from Mylan in connection with administrating benefits for EpiPen.  Defendants' labeling of rebates,

70

fees and other payments received from Mylan determined the amount of monies kept by Defendants and the amount remitted to Class members' ERISA health plans. Moreover, Defendants have the discretion to choose the pharmacy reimbursement rate for EpiPen to further control the compensation Defendants receive and retain, as well as the out-of-pocket costs to Class members.

156. Defendants acted as fiduciaries by leveraging their authority over plan assets, including their service agreements with Third-Party Payers, Class members' ERISA health plans, and access to Class members' prescription drug benefits under their ERISA health plans, in order to extract rebates and other monies from Mylan.

157. Defendants act as fiduciaries through the exclusion of prescription drugs from Class members' ERISA health plans' formularies and/or the placement of prescription drugs on specific tiers of Class members' ERISA health plan formularies. In doing so, Defendants have the authority and discretion to drive prescription drug benefits to drugs placed in lower or preferred tiers and limit prescription drug benefits to drugs that are excluded or placed in higher or non-preferred tiers.

158. Defendants acted as fiduciaries in exercising their authority over the price paid by Class members for EpiPen by extracting rebates and other monies from Mylan related to EpiPen. Defendants also had discretion to set the price paid for EpiPen by Class members by choosing the pharmacy reimbursement rate for EpiPen, which determined Class members' out-of-pocket costs at the pharmacy.

159. Defendants acted as fiduciaries while engaging in the invoicing and collection of rebates and other monies from Mylan related to EpiPen because those

transactions directly affected the benchmark price of EpiPen, and, in turn, Defendants' administration of prescription drug benefits under deductible and coinsurance provisions of Class members' ERISA health plans.

160.   Defendants acted as fiduciaries in the administration of prescription drug benefits for EpiPen because the extraction of rebates and other monies from Mylan related to EpiPen directly affected the benchmark price of EpiPen, and, in turn, Defendants' administration of prescription drug benefits under deductible and coinsurance provisions in the Class members' health plans and the payments incurred by Class members under those provisions.

## A.   Fiduciary Duties under ERISA

### 1.   *The Duty of Loyalty*

161.   Section 404(a)(1)(A) of ERISA, 29 U.S.C. §§ 1104(a)(1)(A), provides that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the plan's participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries.  Encompassed in this duty is the duty to avoid conflicts of interest and the duty to disclose and inform (and not misinform).

162.   Defendants violated their duty to administer prescription drug benefits solely in the interests of Class members, ERISA health insurance plan members. Defendants induced EpiPen benchmark price increases through the invoicing and collection of increasing rebates and other monies from Mylan related to EpiPen in exchange for (i) placement of EpiPen on Class members' ERISA health plan formularies; (ii) placement of EpiPen on particular tiers of Class members' ERISA health plan

72

formularies; (iii) delivering a certain market share or number of prescriptions for EpiPen; and/or (iv) reporting data to Mylan regarding EpiPen utilization, EpiPen market share, and/or the number of filled prescriptions for EpiPen.  Defendants kept a significant portion of those monies for themselves, and at the same time administered prescription drug benefits for EpiPen based on the benchmark price or a percentage thereof, resulting in enormous increases in out-of-pocket costs borne by members of the Class.

163.   Defendants further violated the duty of loyalty by engaging in conduct that creates a conflict of interest between Defendants and the Class.  Defendants' interests are to maximize rebates and other monies received from Mylan, a significant portion of which they keep for themselves, and that are determined by the benchmark price.  A higher benchmark price for EpiPen increases the amount of rebates and other monies that Defendants can keep for themselves.  Defendants' interests are adverse to Class member interests in minimizing out-of-pocket deductible and coinsurance payments for EpiPen, which are also determined by the benchmark price.

164.   Defendants further violated the duty of loyalty by leveraging their authority over plan assets, including their service agreements with Class members' ERISA health plans, and access to Class members' prescription drug benefits under those plans in order to maximize rebates and other monies from Mylan related to EpiPen for Defendants' own profit, and at the expense of plan members.

**2.     *The Duty Not to Deal in Plan Assets for One's Own Interest or Account***

165.   Section 406(b)(1) of ERISA, 29 U.S.C. § 1106(b)(1), strictly prohibits a fiduciary from "deal[ing] with the assets of the plan for his own interest or for his own

73

account."

166.   Defendants violated this prohibition by leveraging their authority over plan assets, including their service agreements with Third-Party Payers, Class members' ERISA health plans, and access to Class members' prescription drug benefits under those plans, in order to maximize rebates and other monies from Mylan related to EpiPen for Defendants' own profit.

167.   Defendants further violated this prohibition by administering prescription drug benefits in exchange for rebates and other payments from Mylan from which they profited.   Each time Defendants administered benefits for a Class member filling an EpiPen prescription, Defendants realized one or more rebates and/or other payments from Mylan that Defendants kept, in whole or in part, for themselves.   Even when a Class member with a deductible paid the full pharmacy reimbursement rate for EpiPen, Defendants realized one or more rebates and/or other payments from Mylan that Defendants kept, in whole or in part, for themselves.   And the more instances where Defendants administered benefits for EpiPen—thereby yielding payments from Mylan to keep for themselves—the more Defendants incentivized Mylan to further increase the list price for EpiPen at the expense of the Class.

### 3.      *The Duty to Avoid Conflicted Transactions*

168.   Section 406(b)(2) of ERISA, 29 U.S.C. § 1106(b)(2), strictly prohibits a fiduciary from engaging "in any transaction involving the plan on behalf of a party . . . whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries."

169. Defendants violated their duty to avoid conflicted transactions by extracting increasing rebates and other monies from Mylan related to EpiPen, in exchange for placement of EpiPen on Defendants' formularies and/or delivering a certain market share or number of prescriptions, because doing so induced Mylan to raise the list price of EpiPen at the expense of the Class. Defendants knew, or reasonably should have known, that these actions would injure Class members, who paid an amount for EpiPen based on the list price.

170. Defendants' conduct creates a conflict of interest between Defendants and the Class. Defendants' interests are to maximize rebates and other monies received from Mylan, a significant portion of which they keep for themselves, and that are determined by the benchmark price. A higher benchmark price for EpiPen increases the amount of rebates and other monies that Defendants can keep for themselves. Defendants' interests are adverse to Class member interests in minimizing out-of-pocket deductible and coinsurance payments for EpiPen, which are also determined by the benchmark price.

171. These transactions involve Class members' ERISA health plans because Mylan's payments to Defendants are invoiced based on the number of filled EpiPen prescriptions by Class members, which necessarily involves Defendants' administration of prescription drug benefits for Class members on behalf of their ERISA health plans and a subsequent reimbursement for the administration of those benefits by those plans. These transactions also involve Class members' ERISA health plans because Defendants entered into agreements with their health plans to pass back some portion of

75

Mylan's payments to Class members' health plans.

## B.     Co-Fiduciary Liability

172.    ERISA also holds fiduciaries liable for the misconduct of co-fiduciaries. ERISA § 405(a), 29 U.S.C. § 1105(a).   Co-fiduciary liability is an important part of ERISA's regulation of fiduciary responsibility.    Because ERISA permits the fractionalization of fiduciary duties, there may be, as in this case, more than one ERISA fiduciary involved in a given issue.

173.    Defendants are liable for other fiduciaries' misconduct as co-fiduciaries. Defendants are fiduciaries with respect to the ERISA health insurance plans at issue in this case and (1) knowingly participated in other fiduciaries' breaches under ERISA § 404(a)(1); (2) enabled other fiduciaries' breaches of ERISA § 404(a)(1) through conduct that gives rise to Defendants' fiduciary status; or (3) had knowledge of breaches of ERISA § 404(a)(1) by other fiduciaries without taking reasonable efforts to remedy such breaches.

174.    Specifically, the administrators and/or trustees of Class members' ERISA health plans unwittingly breached their fiduciary duties to the Class by accepting formularies designed by Defendants to maximize the payment of rebates and other monies from Mylan related to EpiPen that induced benchmark price increases for EpiPen at the expense of the Class.   Defendants enabled and knowingly participated in these breaches by designing formularies for Class members' ERISA health plans that limited the scope of covered epinephrine auto-injectors in favor of EpiPen and gave preferred tiering to EpiPen in order to maximize rebates and other monies from Mylan

related to EpiPen at the expense of the Class.  Defendants also had knowledge of these breaches and failed to take reasonable efforts to remedy them because they administered benefits for EpiPen to the Class based on the benchmark price.

175.   The administrators and/or trustees of Class members' ERISA health plans unwittingly breached their fiduciary duties to the Class by choosing Defendants as plan service providers, as Defendants engaged in conduct that increased out-of-pocket costs for the Class related to EpiPen.  The administrators and/or trustees of Class members' ERISA health plans chose Defendants as plan service providers in order to achieve savings for the plans and their participants and beneficiaries.  However, choosing Defendants as service providers allowed Defendants to leverage their authority over plan assets, including their service agreements with Third-Party Payers, Class members' ERISA health plans, and access to Class members' prescription drug benefits under their ERISA health plans, in order to maximize rebates and other monies from Mylan related to EpiPen, which induced benchmark price increases for EpiPen at the expense of the Class.  In doing so, Defendants knowingly participated in and enabled these breaches.  Defendants also had knowledge of these breaches and failed to take reasonable efforts to remedy them because they administered benefits for EpiPen to the Class based on the benchmark price.

176.   The administrators and/or trustees of Class members' ERISA health plans unwittingly breached their fiduciary duties to the Class by entering into PBM service agreements that provided Defendants the discretion to label monies received from Mylan in a manner that allowed Defendants to avoid passing the contemplated

77

percentage of those monies to Class members' health plans.  Defendants knowingly participated in and enabled these breaches by labeling monies received from Mylan in a manner that allowed Defendants not to pass the percentage of rebates contemplated by the agreements between Defendants and Class members' health plans.  In doing so, Defendants also had knowledge of these breaches and failed to take reasonable efforts to remedy them

177.   The administrators and/or trustees of Class members' ERISA health plans unwittingly breached their fiduciary duties to the Class by paying excessive fees to Defendants for pharmacy benefit management services and formulary services.  The administrators and/or trustees of Class members' ERISA health plans paid fees to Defendants in order to receive 80%-100% of monies that Defendants received from Mylan to help offset plan costs.  However, Defendants failed to pass back all monies received from Mylan to Class members' ERISA health plans.  Instead, Defendants exercised their discretion to label monies received from Mylan in a manner that allowed Defendants to avoid passing the contemplated percentage of those monies to Class members' health plans.  Consequently, Class members' health plans paid fees to Defendants for monies related to EpiPen that they did not receive.

178.   Defendants knowingly participated in and enabled these breaches by labeling monies received from Mylan in a manner that allowed Defendants not to pass the percentage of rebates contemplated by the agreements between Defendants and Class members' health plans.  In doing so, Defendants also had knowledge of these breaches and failed to take reasonable efforts to remedy them.

C.     **Non-Fiduciary Liability**

179.   Non-fiduciaries may be held liable for ERISA violations where they knowingly participate in a fiduciary's breach of duty or a prohibited transaction. Accordingly, as to the ERISA claims asserted in this Complaint, even if Defendants are not found to have fiduciary status themselves, they must nevertheless restore unjust profits or funds and are subject to other appropriate equitable relief pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

180.   The administrators and/or trustees of Class members' ERISA health plans unwittingly breached their fiduciary duties to the Class by accepting formularies designed by Defendants to maximize the payment of rebates and other monies from Mylan related to EpiPen that induced benchmark price increases for EpiPen at the expense of the Class.  Defendants enabled and knowingly participated in these breaches by designing formularies for Class members' ERISA health plans that limited the scope of covered epinephrine auto-injectors in favor of EpiPen and gave preferred tiering to EpiPen in order to maximize rebates and other monies from Mylan related to EpiPen at the expense of the Class.  Defendants also had knowledge of these breaches because they administered benefits for EpiPen to the Class based on the benchmark price.

181.   The administrators and/or trustees of Class members' ERISA health plans unwittingly breached their fiduciary duties to the Class by choosing Defendants as plan service providers, as Defendants engaged in conduct that increased out-of-pocket costs for the Class related to EpiPen.  The administrators and/or trustees of Class members' ERISA health plans chose Defendants as plan service providers in order to achieve

savings for the plans and plan members.  However, choosing Defendants as service providers allowed Defendants to leverage their authority over plan assets, including their service agreements with Third-Party Payers, Class members' ERISA health plans, and access to Class members' prescription drug benefits under their ERISA health plans, in order to maximize rebates and other monies from Mylan related to EpiPen, which induced benchmark price increases for EpiPen at the expense of the Class.  In doing so, Defendants knowingly participated in and enabled these breaches.  Defendants also had knowledge of these breaches because they administered benefits for EpiPen to the Class based on the benchmark price.

182.    The administrators and/or trustees of Class members' ERISA health plans unwittingly breached their fiduciary duties the Class by entering into PBM service agreements that provided Defendants the discretion to label monies received from Mylan in a manner that allowed Defendants to avoid passing the contemplated percentage of those monies to Class members' health plans.  Defendants knowingly participated in and enabled these breaches by labeling monies received from Mylan in a manner that allowed Defendants not to pass the percentage of rebates contemplated by the agreements between Defendants and Class members' health plans

183.    The administrators and/or trustees of Class members' ERISA health plans unwittingly breached their fiduciary duties to the Class by paying excessive fees to Defendants for pharmacy benefit management services and formulary services.  The administrators and/or trustees of Class members' ERISA health plans paid fees to Defendants in order to receive 80%-100% of monies that Defendants received from

Mylan related to EpiPen to help offset plan costs.  Defendants failed to pass back all monies received from Mylan related to EpiPen to Class members' ERISA health plans. Instead, Defendants exercised their discretion to label monies received from Mylan in a manner that allowed Defendants to avoid passing back the contemplated percentage of those monies to Class members' health plans.  Consequently, Class members' health plans paid fees to Defendants for monies that they did not receive.  Defendants knowingly participated in and enabled these breaches by labeling monies received from Mylan in a manner that allowed Defendants to avoid passing back the contemplated percentage of those monies to Class members' health plans.

184.    The administrators and/or trustees of Class members' ERISA health plans unwittingly engaged in prohibited transactions by paying fees to Defendants in order to receive 80%-100% monies that Defendants received from Mylan to help offset plan costs.  Defendants failed to pass back all monies received from Mylan to Class members' ERISA health plans, and instead exercised their discretion to label monies received from Mylan in a manner that allowed Defendants to avoid passing back the contemplated percentage of monies to Class members' health plans.  Consequently, Class members' health plans paid fees to Defendants for monies that they did not receive and that induced Mylan to raise the list price of EpiPen at the expense of Class members.  Defendants knowingly participated in and enabled these breaches by labeling monies received from Mylan in a manner that allowed Defendants to avoid passing back the contemplated percentage of those monies to Class members' health plans.

## FIRST CLAIM FOR RELIEF

### ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3) for Breach of Fiduciary
### Duties under ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)

185.    Plaintiff incorporates by reference each of the preceding paragraphs as though fully set forth herein.

186.    ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1) provides that a fiduciary shall discharge its duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of administering the plan.

187.    Defendants are fiduciaries of the ERISA health insurance plans in which Plaintiff and/or Class members are or were participants or beneficiaries because Defendants exercise discretionary authority and/or discretionary control over prescription drug benefits.  As such, they owe fiduciary duties under ERISA to the Class members.

188.    Defendants breached their duty of loyalty under ERISA § 404(a)(1)(A) because Defendants caused EpiPen benchmark price inflation through the extraction of increasing rebates and other monies from Mylan related to EpiPen.  Defendants kept a significant portion of these rebates as profit, while at the same time administering prescription drug benefits for EpiPen based on the benchmark price or a percentage thereof, resulting in enormous increases in out-of-pocket costs borne by members of the Class.

189.    Defendants further breached their fiduciary duty by leveraging their access to and authority over plan assets, including their service agreements with Third-Party Payers, Class members' ERISA health plans, and access to Class members' prescription

82

drug benefits under their ERISA health plans, in order to extract rebates and other monies from Mylan. Defendants' actions were to the detriment of participants and beneficiaries, breaching their duties of loyalty. Defendants failed to put the interests of participants and beneficiaries first in managing and administering plan benefits, breaching their fiduciary duty of loyalty.

190. Defendants further breached their duties of loyalty by directing and setting their own compensation that resulted in excessive payments to Defendants obtained through leveraging their role as a fiduciary to Class members' ERISA health plans.

191. In so doing, Defendants failed to act solely in the interest of Plaintiff and the Class, and instead acted in their own interests at the expense of Plaintiff and the Class.

192. Defendants' breaches of fiduciary duty caused direct injury and losses to Plaintiff and the Class.

193. Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132 (a)(3), the Court should order equitable relief to Plaintiff and Class members, including, but not limited to: an accounting; a surcharge; correction of the transactions; a remand of prescription drug benefit claims; disgorgement of profits; an equitable lien; a constructive trust; restitution; full disclosure of the foregoing acts and practices; an injunction against further violations; and/or any other remedy the Court deems proper.

## SECOND CLAIM FOR RELIEF

### ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3) for Prohibited Transactions under ERISA § 406(b), 29 U.S.C. § 1106(b)

194. Plaintiff incorporates by reference each of the preceding paragraphs as though fully set forth herein.

195.   Section 406(b)(1) of ERISA, 29 U.S.C. § 1106(b)(1), strictly prohibits a fiduciary from "deal[ing] with the assets of the plan for his own interest or for his own account."  Defendants violated this prohibition by leveraging their authority over plan assets, including their service agreements with Class members' ERISA health plans and access to Class members' prescription drug benefits under those plans, in order to maximize rebates and other monies from Mylan related to EpiPen for Defendants' own profit.

196.   Defendants further violated this prohibition by administering prescription drug benefits in exchange for rebates and other payments from Mylan from which they profited.  Each time Defendants administered benefits for a Class member filling an EpiPen prescription, Defendants received one or more rebates and/or other payments from Mylan that Defendants kept for themselves.  And the more instances where Defendants administered benefits for EpiPen—thereby yielding payments from Mylan to keep for themselves—the more Defendants incentivized Mylan to increase the list price for EpiPen at the expense of the Class.

197.   Section 406(b)(2) of ERISA, 29 U.S.C. § 1106(b)(2), strictly prohibits a fiduciary from engaging "in any transaction involving the plan on behalf of a party . . . whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries."  Defendants violated their duty to avoid conflicted transactions by extracting increasing rebates and other monies from Mylan related to EpiPen, in exchange for placement of EpiPen on Defendants' formularies and/or delivering a certain market share or number of prescriptions, because doing so induced Mylan to

522446.1

raise the benchmark price of EpiPen at the expense of the Class.

198.   Defendants' conduct creates a conflict of interest between Defendants and the Class.  Defendants' interests and incentives are to maximize rebates and other monies received from Mylan, a significant portion of which they keep for themselves, and which inflate the benchmark price.  A higher benchmark price for EpiPen increases the amount of rebates and other monies that Defendants can keep for themselves, but causes increased out-of-pocket costs for Class members.  Defendants' interests are adverse to Class member interests in minimizing out-of-pocket deductible and coinsurance payments for EpiPen, which are also determined by the benchmark price.

199.   These transactions involve Class members' ERISA health plans because Mylan's payments to Defendants are invoiced based on the number of filled EpiPen prescriptions by Class members, which necessarily involves Defendants' administration of prescription drug benefits for Class members on behalf of their health plans and a subsequent reimbursement for the administration of those benefits by the health plans. These transactions also involve Class members' ERISA health plans because Defendants were required to pass back some portion of Mylan's payments to Class members' health plans.

200.   Defendants' violations of ERISA § 406(b) caused direct injury and losses to Plaintiff and the Class.

201.   Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132 (a)(3), the Court should order equitable relief to Plaintiff and Class members, including, but not limited to: an accounting;  a  surcharge;  correction  of  the  transactions;  a  remand  of  claims;

disgorgement of profits; an equitable lien; a constructive trust; restitution; full disclosure of the foregoing acts and practices; an injunction against further violations; and/or any other remedy the Court deems proper.

### THIRD CLAIM FOR RELIEF

**ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3) for Violations of
ERISA § 405(a), 29 U.S.C. § 1105(a)**

202.   Plaintiff incorporates by reference each of the preceding paragraphs as though fully set forth herein.

203.   As alleged above, Defendants are fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

204.   ERISA § 405(a), 29 U.S.C. § 1105(a), imposes liability on a fiduciary, in addition to any liability which it may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if: (i) it knowingly participates in a breach or knowingly undertakes to conceal a breach; (ii) enables a breach; or (iii) it knows of a breach and fails to take reasonable efforts under the circumstances to remedy it.

205.   As detailed above, Defendants each had knowledge of, knowingly participated in, and enabled the breaches of the administrators and/or trustees of Class members' ERISA health plans detailed herein.  Defendants made no efforts to remedy those breaches.

206.   As a result of Defendants' conduct and breaches, Plaintiff and the Class suffered direct injury and losses.

207.   Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132 (a)(3), the Court should

86

order equitable relief to Plaintiff and Class members, including, but not limited to: an accounting; a surcharge; correction of the transactions; a remand of claims; disgorgement of profits; an equitable lien; a constructive trust; restitution; full disclosure of the foregoing acts and practices; an injunction against further violations; and/or any other remedy the Court deems proper.

<u>**FOURTH CLAIM FOR RELIEF**</u>

**ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3) for Knowing
Participation In Violation of ERISA**

208.   Plaintiff incorporates by reference each of the preceding paragraphs as though fully set forth herein.

209.   Fiduciary status is not required for liability under ERISA where non-fiduciaries knowingly participate in a fiduciary's breach or prohibited transaction.  To the extent any one or more Defendant is not found to be a fiduciary as alleged above, Defendants are still subject to equitable relief under ERISA based on their knowing participation in fiduciary breaches and prohibited transactions, pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), and *Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238 (2000).

210.   As detailed above, Defendants knowingly participated in the administrators and/or trustees of Class members' ERISA health plans' breaches of fiduciary duty and prohibited transactions.

211.   As a direct and proximate result of the fiduciary breaches and prohibited transactions alleged herein, and the knowing participation therein of the Defendants, Class members suffered losses.

212.   Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132 (a)(3), the Court should order equitable relief to Plaintiff and Class members, including, but not limited to: an accounting; a surcharge; correction of the transactions; a remand of claims; disgorgement of profits; an equitable lien; a constructive trust; restitution; full disclosure of the foregoing acts and practices; an injunction against further violations; and/or any other remedy the Court deems proper.

## VII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for relief as follows:

a.   Certifying this action as a class action and appointing Plaintiff and the counsel listed below to represent the Class;

b.   Finding that Defendants violated their fiduciary duties to ERISA plan members and awarding Plaintiff and the Class such relief as the Court deems proper;

c.   Finding that Defendants engaged in prohibited transactions and awarding Plaintiff and the Class such relief as the Court deems proper;

d.   Finding that Defendants are liable as fiduciaries and/or co-fiduciaries and/or non-fiduciaries;

e.   Awarding Plaintiff and the Class equitable relief to the extent permitted by the above claims, including, but not limited to:  an accounting; a surcharge; correction of the transactions; a remand of claims; disgorgement of profits; an equitable lien; a constructive trust; restitution; full disclosure of the foregoing acts and practices; an injunction against further violations; and/or any other remedy the Court deems proper;

f.   Awarding Plaintiff's counsel attorneys' fees, reimbursement of out-of-pocket litigation expenses, expert witness fees, and other costs pursuant to ERISA § 502(g)(1), 29 U.S.C. § 1132(g)(1), and/or the common fund doctrine; and

g.   Awarding such other and further relief as may be just and proper.

522446.1

Dated: November 17, 2017                Respectfully submitted,

                                        **LOCKRIDGE GRINDAL NAUEN P.L.L.P.**


                                        **/s/Kristen G. Marttila**
                                        Karen Hanson Riebel, #219770
                                        David W. Asp, #344850
                                        Kristen G. Marttila, #346007
                                        100 Washington Avenue South
                                        Minneapolis, MN 55401
                                        Telephone: (612) 339-6900
                                        Fax: (612) 339-0981
                                        Email: khriebel@locklaw.com
                                               dwasp@locklaw.com
                                               kgmarttila@locklaw.com

                                        **BERMAN TABACCO**

                                        Kathleen M. Donovan-Maher (*Pro Hac Vice*)
                                        Patrick T. Egan (*Pro Hac Vice*)
                                        Justin N. Saif (*Pro Hac Vice*)
                                        Steven L. Groopman (*Pro Hac Vice*)
                                        One Liberty Square, 8th Floor
                                        Boston, MA 02109
                                        Telephone: (617) 542-8300
                                        Fax: (617) 542-1194
                                        Email: kdonovanmaher@bermantabacco.com
                                               pegan@bermantabacco.com
                                               jsaif@bermantabacco.com
                                               sgroopman@bermantabacco.com

                                        Christopher Heffelfinger (*Pro Hac Vice Forthcoming*)
                                        44 Montgomery Street, Suite 650
                                        San Francisco, CA  94104
                                        Telephone: (415) 433-3200
                                        Fax: (415) 433-6382
                                        Email: cheffelfinger@bermantabacco.com

**THE MAUL FIRM, P.C.**

Anthony F. Maul (*Pro Hac Vice*)
68 Jay Street, Suite 201
Brooklyn, NY 11201
Telephone: (718) 395-4918
Email: afmaul@maulfirm.com